# IN THE COURT OF APPEALS OF IOWA

No. 15-1772
Filed February 22, 2017

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JORDAN CAMPBELL,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Adair County, Randy V. Hefner, Judge.

A criminal defendant appeals the denial of his motion to suppress evidence and subsequent convictions for possession of a controlled substance with intent to deliver and failure to affix a drug tax stamp. **CONVICTIONS VACATED AND REMANDED.**

Dean A. Stowers of Stowers & Sarcone PLC, West Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Jean C. Pettinger, Assistant Attorney General, for appellee.

Heard by Danilson, C.J., and Doyle and McDonald, JJ.

**MCDONALD, Judge.**

Defendant Jordan Campbell appeals the district court's denial of his motion to suppress evidence and subsequent convictions for possession of marijuana with the intent to deliver and failure to affix a drug tax stamp. Campbell contends the contraband found in his vehicle was discovered only as the result of an unconstitutional traffic stop and detention.

I.

An Iowa State Patrol trooper was traveling on Interstate 80 when he observed two vehicles—a white truck and black minivan—with non-Iowa license plates traveling the opposite direction. The trooper believed the vehicles were exceeding the speed limit. Using a speed gun, he determined the vehicles were speeding. As the trooper and the vehicles passed each other on opposite sides of the interstate, the trooper observed the driver of the truck lean forward, grasp the steering wheel, readjust himself in his seat, and concernedly watch the trooper. The trooper turned around in a crossover area with the intent to catch up with the two vehicles. The trooper contacted a second trooper in the area and asked the second trooper to watch for the vehicles. The second trooper advised the vehicles had just passed.

When the first trooper caught up with the vehicles, the minivan was approximately half a mile behind the truck and had decreased its speed to below the speed limit, which the trooper found suspicious. The minivan had license plates from Washington state. The trooper pulled alongside the minivan to conduct a seatbelt check. He observed the minivan's driver was stiff-armed with his hands on the steering wheel at the ten and two positions. The driver initially

avoided looking at the trooper. When the driver eventually looked at the trooper, the driver signaled whether the trooper wanted him to pull over. The trooper suspected the minivan and truck were traveling together and the minivan was a "decoy vehicle" to be pulled over so the truck could proceed on without interference.

The trooper proceeded past the minivan and caught up with the truck, which was now traveling below the speed limit. The truck had Oregon license plates. The trooper pulled alongside the truck to conduct a seatbelt check. He saw the driver, now known to be Campbell, "jamming out to music playing the drums on his steering wheel." The trooper believed the driver was nervous but feigning calm.

Based on his training and experience, the trooper believed he had probable cause to stop the vehicle for speeding and reasonable suspicion of some criminal activity, and he initiated a traffic stop. At approximately the same time, the second trooper initiated a stop of the minivan. At the time the trooper stopped Campbell, the trooper had already determined he was only going to issue Campbell a written warning for speeding.

As the trooper approached the truck, the trooper observed several totes and a fan in the enclosed truck bed. Empty energy-drink cans and bottles and trash littered the vehicle floor—the trooper believed this to be evidence of "hard traveling" to avoid unnecessary stops. Campbell had only one key on his key ring, from which the trooper inferred a third party owned the vehicle. The trooper asked Campbell for his license, registration, and proof of insurance. Campbell

did not have his registration papers because he had only recently purchased the vehicle. Campbell voluntarily told the trooper he was traveling to Ohio.

The trooper had Campbell accompany him to the trooper's vehicle. Upon entering the vehicle, the trooper asked Campbell a variety of questions, which Campbell answered. The first set of questions related to Campbell's destination and purpose and travel schedule. The trooper also asked questions to complete the written warning: height, weight, eye color, hair color. After asking questions related to the written warning, the trooper asked Campbell questions regarding his hometown, his background, and his plans in Ohio. The trooper then asked questions regarding ownership of the truck and the items in the truck. The trooper next asked Campbell whether the information on Campbell's license was current; whether Campbell had any revocations, suspensions, or warrants; and whether Campbell had ever been arrested. With Campbell still in the vehicle, the trooper called dispatch to check the status of Campbell's license and run a check for outstanding warrants. While waiting for a response, the trooper continued with further inquiries regarding Campbell's travel plans. The trooper asked Campbell if he was nervous, and Campbell denied the same. The trooper put to Campbell more questions regarding ownership of the truck and whether Campbell had roommates in Oregon. The trooper then radioed dispatch and asked if the checks had come back with anything. The dispatcher responded they had "replied to [the trooper] a couple times, apparently [the trooper] didn't hear [them]." The dispatcher informed the trooper everything was fine. Undeterred, the trooper commenced additional questioning regarding Campbell's purchase of the truck.

While the trooper was questioning Campbell in the trooper's vehicle, the trooper was exchanging emails with the second trooper that had stopped the minivan. They exchanged eight emails. The emails discussed Campbell's demeanor and physical condition, Campbell's travel plans, Campbell's claim he was traveling alone, information regarding the occupants of the minivan, and the first trooper's belief criminal activity was afoot.

Almost seventeen minutes after the trooper brought Campbell back to the trooper's vehicle, the trooper told Campbell he was going to give Campbell a warning and asked Campbell to sign it. After Campbell signed the warning, the trooper received a phone call from the second trooper. The second trooper relayed additional information learned from the occupants of the minivan. The information showed, according to the trooper, the vehicles were traveling together and Campbell was lying. The trooper proceeded to question Campbell for three more minutes before he told Campbell he was not free to leave. The trooper told Campbell he was going to use a drug dog on Campbell's vehicle and asked Campbell if he had any contraband in his vehicle to which the dog would alert. Campbell answered in the negative, but the drug dog answered in the affirmative. The trooper searched the vehicle without a warrant and found marijuana. Campbell was arrested on the scene. He was convicted of the above-stated offenses following a trial on the minutes.

## II.

We review constitutional claims de novo. *See State v. Walshire*, 634 N.W.2d 625, 626 (Iowa 2001). We examine the entire record, including evidence presented at the suppression hearing. *See State v. Jones*, 666 N.W.2d 142, 145

(Iowa 2003). Although our review is de novo, for policy reasons we afford deference to the decision of the district court. *See State v. Naujoks*, 637 N.W.2d 101, 106 (Iowa 2001); *In re P.C.*, No. 16-0893, 2016 WL 4379580, at *2 (Iowa Ct. App. Aug. 17, 2016) (stating appellate courts should exercise "de novo review with deference" in "recognition of the appellate court's limited function of maintaining the uniformity of legal doctrine; recognition of the district court's more intimate knowledge of and familiarity with the parties, the lawyers, and the facts of a case; and recognition there are often undercurrents in a case—not of record and available for appellate review—the district court does and should take into account when making a decision").

III.

Campbell raises several claims of error in three broad categories. First, Campbell challenges the initiation of the traffic stop. Campbell contends the stop was not supported by probable cause because he was not speeding. He contends the traffic stop was pretextual and pretextual stops are prohibited by article I, section 8 of the Iowa Constitution. He also contends the trooper targeted out-of-state motorists in violation of his rights to equal protection guaranteed by the federal and state constitutions. Second, Campbell argues the duration and scope of the roadside detention violated his right to be free from unreasonable search and seizure under the federal constitution. Specifically, he argues the trooper impermissibly ordered Campbell into the trooper's vehicle. He argues the trooper impermissibly expanded the duration of the stop by engaging in questioning unrelated to the purpose of the traffic stop. He also argues the trooper impermissibly expanded the scope of the stop by asking questions

unrelated to the purpose of the stop. Third, Campbell argues the trooper conducted an illegal trespassory search of Campbell's vehicle when the trooper directed the drug dog to place its paws on Campbell's vehicle.

We address only the duration of the traffic stop and its investigative scope. "Because our decision on this issue is dispositive, we need not address the other issues." *State v. Cox*, 500 N.W.2d 23, 24 (Iowa 1993).

A.

We begin our analysis with first principles. The Fourth Amendment to the United States Constitution provides "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The "textual touchstone of the Fourth Amendment is reasonableness." *State v. Lewis*, 675 N.W.2d 516, 529 (Iowa 2004) (Cady, J., dissenting) (citation omitted). The Fourth Amendment is applicable to state actors by incorporation via the Fourteenth Amendment. *See Mapp v. Ohio*, 367 U.S. 643, 660 (1961). The Fourth Amendment is implicated when an officer seizes a person. *See State v. Reinders*, 690 N.W.2d 78, 82 (Iowa 2004). A traffic stop constitutes a seizure within the meaning of the Fourth Amendment. *See State v. Tyler*, 830 N.W.2d 288, 292 (Iowa 2013). As such, a traffic stop must be reasonable under the circumstances. *See Whren v. United States*, 517 U.S. 806, 809–10 (1996); *State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002).

We must distinguish between two categories of traffic stops. The first category is a traffic stop initiated to investigate and enforce violations of the traffic laws. A stop of this nature is reasonable when the law enforcement officer has

probable cause to believe the motorist violated the traffic or safety code. *See Whren*, 517 U.S. at 810. "Probable cause exists if the totality of the circumstances as viewed by a reasonable and prudent person would lead that person to believe that a crime has been or is being committed and that the arrestee committed or is committing it." *State v. Bumpus*, 459 N.W.2d 619, 624 (Iowa 1990). When an officer "observes a violation of our traffic laws, however minor, the officer has probable cause to stop a motorist." *State v. Tague*, 676 N.W.2d 197, 201 (Iowa 2004). The second category of traffic stop is an investigative stop based on the law enforcement officer's reasonable suspicion the motorist is engaged in criminal activity. "Reasonable suspicion to stop a vehicle for investigative purposes exists when articulable facts and all the circumstances confronting the officer at the time give rise to a reasonable belief that criminal activity may be afoot." *State v. McIver*, 858 N.W.2d 699, 702 (Iowa 2015). The categories are not mutually exclusive. *See id.* Regardless, following a lawfully initiated traffic stop, the reasonability, and thus constitutionality, of continued detention is determined by two independent but interrelated variables—duration and investigative scope. *See Berkermer v. McCarty*, 468 U.S. 420, 439 (1984) (stating a traffic stop is analogous to a *Terry* stop); *Terry v. Ohio*, 392 U.S. 1, 19 (1968) (holding the "scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible" (citation omitted)); *Knowles v. Iowa*, 525 U.S. 113, 117 (1998) ("A routine traffic stop, on the other hand, is a relatively brief encounter and 'is more analogous to a so-called "*Terry* stop" . . . than to a formal arrest.'" (alteration in original)).

B.

Campbell first challenges the constitutionality of the duration of the stop. Campbell argues the trooper unreasonably, and thus unconstitutionally, extended the duration of the stop beyond the time necessary to complete the mission of the stop. Two recent cases are dispositive of the issue.

In *Rodriguez v. United States*, 135 S. Ct. 1609, 1614–15 (2015), the Supreme Court stated the permissible investigative scope of a traffic stop initiated to enforce the traffic laws included law enforcement inquiries related to "the traffic violation that warranted the stop" as well as de minimis regulatory inquiries relating to the enforcement of the traffic laws. *See Rodriguez*, 135 S. Ct. at 1614–15 (stating the officer may ask for driver's license, registration, and proof of insurance and determine whether there are outstanding warrants against the driver); *see also State v. Coleman*, No. 15-0752, 2016 WL 1682128, at *7 (Iowa Ct. App. Apr. 27, 2016) (McDonald, J., concurring specially) ("The officer's ability to conduct such inquiry is justified, for constitutional purposes, by the government's legitimate interests in enforcement of the traffic laws and protecting officer safety when balanced against the de minimis imposition upon the detained motorist."). *Rodriguez* held the permissible duration of a traffic stop "may 'last no longer than is necessary to effectuate [its] purpose.' Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 135 S. Ct. at 1614 (citations omitted). "If an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission,'" and any stop that

goes beyond that point is unlawful. *Id.* at 1616 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)) (alteration in original).

Subsequent to *Rodriguez*, the Iowa Supreme Court decided *In re Pardee*, 872 N.W.2d 384 (Iowa 2015). The question presented in that case was whether the officer impermissibly extended the duration of a traffic stop initiated to enforce the traffic laws. In concluding the officer unlawfully extended the duration of the roadside detention, the *Pardee* court reiterated the central tenets of *Rodriguez*. First, the permissible investigative scope of a traffic stop is to address the infraction giving rise to the stop and to conduct certain unrelated checks related to the enforcement of the traffic laws and officer safety. *See Pardee*, 872 N.W.2d at 392–93. Second, the permissible duration of the traffic stop is the amount of time reasonably required to complete the mission of the stop. *See id.* The *Pardee* court concluded the officer could expand the scope and duration of the traffic stop where the officer had reasonable suspicion the detained motorist was engaged in criminal activity so long as the officer's reasonable suspicion was developed prior to the impermissible extension of the stop. *See id.* at 396 (stating the test is "whether individualized suspicion to justify" continued detention "would have existed without [impermissible] delay"). The court held the officer had not developed individualized suspicion of criminal activity prior to the unlawful extension of the traffic stop and the stop was unconstitutional. *See id.* at 396–97.

We need not discuss the numerous facts and circumstances that may or may not have supported the conclusion the trooper here developed reasonable suspicion of criminal activity prior to extending the duration of the stop beyond

that necessary to complete the mission of the stop; the State concedes the officer extended the duration of the stop beyond that necessary to complete the mission of the stop prior to developing reasonable suspicion Campbell was engaged in criminal activity. The State argues the *Pardee* "majority opinion wrongly analyzed the reasonable suspicion issue" and requests we adopt the dissenting opinion in *Pardee*. We decline to do so. This court is "not at liberty to overturn Iowa Supreme Court precedent." *State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990).

Independent of the State's concession, we agree *Pardee* is controlling on the issue of whether the trooper impermissibly extended the duration of the traffic stop at issue. The trooper initiated the traffic stop after observing Campbell commit a moving violation. The trooper admitted at the suppression hearing he lacked reasonable suspicion of any particularized criminal activity at the time of the stop and did not develop suspicion of any particular criminal activity until after the drug dog alerted on Campbell's vehicle.

> Q. Okay. Now, prior to deploying the dog, you were talking earlier about the fact that you had reasonable suspicion in your mind of some criminal activity, right? A. Correct.
> Q. Okay. Now what was the crime? What was the crime? A. At that point it was unknown.
> Q. Okay. Unknown type? A. Correct.
> Q. Could have been theft? A. Could have been.
> Q. Could have been robbery? A. Yes.
> Q. Could have been some kind of fraud? A. Yes.
> Q. Bank robbery? A. Yes.
> Q. Could have been anything? A. Correct.
> Q. All right. Could have been drugs? A. Correct.

"Mere suspicion, curiosity, or hunch of criminal activity is not enough." *Tague*, 676 N.W.2d at 204. If the trooper had reasonable suspicion at all when

he conducted the dog sniff, it was the byproduct of a stop that had been "prolonged past its permissible length in violation of *Rodriguez*[, *Pardee*,] and the Fourth Amendment." *Pardee*, 872 N.W.2d at 397. Accordingly, the district court erred in denying Campbell's motion to suppress evidence.

C.

Although the State's concession regarding *Pardee* is an independent ground to conclude the district court erred in denying Campbell's motion to suppress evidence, we address Campbell's interrelated claim regarding the investigative scope of the detention. Campbell contends the trooper unlawfully expanded the investigative scope of the stop when the trooper asked Campbell questions wholly unrelated to the purpose of the stop. If this were a case of first impression, we would agree and hold the investigative scope of a roadside detention must be reasonably related to the "mission of the stop," including de minimis regulatory inquiries relating to officer safety and the enforcement of the traffic laws, such as a check for outstanding warrants and a request the motorist produce a driver's license, proof of insurance, and vehicle registration.[1] *See Rodriguez*, 135 S. Ct. at 1614–15; *Coleman*, 2016 WL 1682128, at *7

---

[1] While there is some authority supporting the proposition that an officer can also ask about destination and purpose without individualized suspicion, *see, e.g., State v. Aderholdt*, 545 N.W.2d 559, 564 (Iowa 1996), the authority is without sound footing. *Aderholdt* relies on *United States v. Barahona*, 990 F.2d 412 (8th Cir. 1993). In *Barahona*, a trooper had pulled the defendant over for driving erratically. *See* 990 F.2d at 414. The trooper asked about the defendant's destination and purpose. *See id.* The *Barahona* court found the questions permissible because they were "reasonably related to ascertaining the reasons for [the defendant's] erratic driving and whether he posed a danger to others on the road." *Id.* at 416. In other words, the destination and purpose questions in that case were reasonably related to the mission of the traffic stop. *See id.* *Barahona* and the cases relying on it, properly understood, only authorize questions regarding destination and purpose when those questions are reasonably related to the justification for the traffic stop.

(McDonald, J., concurring specially). In the absence of consent or the development of reasonable suspicion, all other unrelated inquiries would be prohibited. This is not a question of first impression, however.

We begin at the beginning. In *Terry v. Ohio* the Supreme Court set forth the principles that would eventually develop into the legal framework governing the constitutionality of seizures not amounting to custodial arrest. *See* 392 U.S. at 19. The Supreme Court concluded the reasonability, and thus constitutionality, of a lawfully-initiated seizure is determined by its duration and investigative scope. *See id.*

For some period of time, the Supreme Court continued to recognize the duration and the investigative scope of a detention were independent tests in determining the constitutionality of a limited detention. *See, e.g., Caballes*, 543 U.S. at 419 (Ginsburg, J., dissenting) (recognizing that "the Court has several times indicated that the limitation on 'scope' is not confined to the duration of the seizure; it also encompasses the manner in which the seizure is conducted"); *United States v. Hensley*, 469 U.S. 221, 235 (1985) (analyzing a *Terry* stop in terms of "length and intrusiveness of the stop and detention that actually occurred"); *Florida v. Royer*, 460 U.S. 491, 500 (1983) ("[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was

sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.").

Subsequent to *Terry*, many federal circuit courts also recognized the independent nature of the duration and scope tests:

> Drawing upon the common-sense notion that reasonableness includes both a scope and a duration dimension, this circuit had held that police officers may not ask questions unrelated to the purpose of a traffic stop, unless there is an independent source of reasonable suspicion. *See, e.g., United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996) (A police officer had sufficient reasonable and articulable suspicions of drug courier activity to justify a speedy, unintrusive criminal record inquiry after a traffic stop.); *United States v. Rivera*, 906 F.2d 319, 322 (7th Cir. 1990) (Certain of the questions asked by a trooper of an individual during a traffic stop were casual banter or were justified by the trooper's reasonable suspicion.). This circuit has not been alone in its interpretation of the Fourth Amendment. The Eighth, Ninth, and Tenth Circuits are wholly in agreement. *See, e.g.,* [*United States v.*] *Holt*, 264 F.3d [1215,] 1230 [(10th Cir. 2001] (concluding that both the length and scope of a traffic stop are relevant factors in deciding whether the stop comports with the Fourth Amendment); *United States v. Murillo*, 255 F.3d 1169, 1174 (9th Cir. 2001) ("During a traffic stop, a police officer is allowed to ask questions that are reasonably related in scope to the justification for his initiation of contact. In order to broaden the scope of questioning, he must articulate suspicious factors that are particularized and objective." (internal citations omitted)); *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994) (holding that a police officer did not have reasonable suspicion to ask questions not reasonably related to the stop, but finding the subsequent consent nevertheless to be voluntary).

*United States v. Childs*, 277 F.3d 947, 956–57 (7th Cir. 2002) (Cudahy, J., dissenting).

Post-*Terry*, Iowa courts also recognized the independent nature of the duration and scope tests of constitutional reasonableness. *See, e.g., State v. Coleman*, ___ N.W.2d ___, ___ WL ___, at *30 (Iowa 2017) ("Limiting both the scope and duration of warrantless stops on the highway provides important

means of fulfilling the constitutional purpose behind article I section 8, namely, ensuring that government power is exercised in a carefully limited manner."); *State v. McCoy*, 692 N.W.2d 6, 18 (Iowa 2005) (requiring an investigative detention be limited in terms of both scope and duration); *Aderholdt*, 545 N.W.2d at 563 (stating an officer may conduct an investigation "reasonably related in scope to the circumstances which justified the interference in the first place"); *State v. Armstrong*, No. 11-1615, 2012 WL 4513887, at *2 (Iowa Ct. App. Oct. 3, 2012) (holding a "seizure must be limited both in scope and duration").

More recently, however, the Supreme Court collapsed the investigative-scope inquiry into the duration inquiry. *See, e.g., Arizona v. Johnson*, 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."); *Muehler v. Mena*, 544 U.S. 93, 101 (2005) ("As the Court of Appeals did not hold that the detention was prolonged by the [unrelated] questioning, there was no additional seizure within the meaning of the Fourth Amendment. Hence, the officers did not need reasonable suspicion to ask [the defendant] for her name, date and place of birth, or immigration status."); *Caballes*, 543 U.S. at 407 ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."). As one court explained:

> While even members of the United States Supreme Court initially viewed the bright-line rule as effectively discarding the scope requirement of a *Terry* stop, application of *Caballes*, *Muehler*, and

> *Johnson* by lower courts underscores that those cases modified, rather than abandoned, the second prong of the *Terry* test. The temporal limitations on *Terry* stops continue to define the limits of the reasonableness of the scope of the investigation. The questions posed during a traffic stop no longer need to be reasonably related to the initial justification of the stop in order to be permissible under the Fourth Amendment; the length of the stop, however, is limited by the time requirement to conduct a reasonable investigation into the initial justification for the stop.

*State v. Leyva*, 250 P.3d 861, 868 (N.M. 2011). Under the most recent case law, there is no subject-matter limitation on the scope of allowable investigation so long as the unrelated investigation does not prolong the duration of the stop beyond that necessary to complete the mission of the stop. *See Rodriguez*, 135 S. Ct. at 16115 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.").

Jettisoning the investigative-scope test as an independent basis for determining the constitutional reasonableness of a roadside detention and instead relying solely on the duration test is problematic. First, judging the constitutionality of a roadside detention solely on the duration of the stop creates an arbitrary rule. As Justice Thomas noted in his dissent in *Rodriguez*:

> The majority's rule thus imposes a one-way ratchet for constitutional protection linked to the characteristics of the individual officer conducting the stop: If a driver is stopped by a particularly efficient officer, then he will be entitled to be released from the traffic stop after a shorter period of time than a driver stopped by a less efficient officer. Similarly, if a driver is stopped by an officer with access to technology that can shorten a records check, then he will be entitled to be released from the stop after a shorter period of time than an individual stopped by an officer without access to such technology.
>     . . . .

> The majority's logic would produce similarly arbitrary results. Under its reasoning, a traffic stop made by a rookie could be executed in a reasonable manner, whereas the same traffic stop made by a knowledgeable, veteran officer in precisely the same circumstances might not, if in fact his knowledge and experience made him capable of completing the stop faster. We have long rejected interpretations of the Fourth Amendment that would produce such haphazard results, and I see no reason to depart from our consistent practice today.

*Rodriguez*, 135 S. Ct. at 1618–19 (Thomas, J., dissenting).

Second, and related, a time-based constitutional rule is incapable of consistent application in all but the easiest cases. The Supreme Court has declined to adopt a specific time limitation for the duration of a *Terry* stop. *See United States v. Place*, 462 U.S. 696, 711, 711 n.10 (1983) ("We understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct. Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation."). How then is the suppression court to determine a constitutionally reasonable time to complete the mission of any particular stop? Will the State be required to introduce Tayloresque time studies demonstrating the average time to investigate a particular traffic offense or to dispel reasonable suspicion of criminal activity? In the absence of such evidence, would an officer be competent to testify regarding the average duration of a traffic stop with sufficient specificity to provide meaningful guidance to the suppression court? Will the constitutional rule vary from jurisdiction to jurisdiction depending on the local custom and practice of the law enforcement officials within the area or depending on the technology or other resources available to facilitate the investigation? Will the

suppression court be required to sit with stopwatch in hand to determine the exact point at which the officer developed reasonable suspicion to investigate further and whether it was then too late?  Is ten minutes too long to process a speeding ticket?  Ten minutes and twenty seconds?  Ten minutes and forty seconds?  It is unknown.  If minutes and seconds matter, how can the rule be applied with any accuracy in those many circumstances where no video footage of the stop is available?  Our suppression courts will have to wrestle with these confounding issues on end.

Despite the foregoing criticism, *Rodriguez* is to be commended in one sense.  *Rodriguez* appears to be an attempt to create a workable constitutional rule that preserves the objective standard set forth in *Whren* but that limits the wholly discretionary use of pretextual traffic stops for drug interdiction and other general law enforcement purposes.  In that was the intent, it seems *Rodriguez* adopts a largely arbitrary, unworkable rule while doing away with an investigative-scope rule that would better achieve the unstated aims of the *Rodriguez* court.  In resolving the issue on parallel state law grounds, one court noted:

> Having considered all of the circumstances, we conclude the detention inside the patrol car was unreasonable.  Trooper Peech's extensive questioning of Mr. O'Boyle while waiting for dispatch, including questions about what he did for a living, how long he had been doing it, who was filling in for him while he was gone, how long his son had been in Boston, what college his son attended, what courses his son was taking, whether his son lived on campus, where he would stay while visiting his son, why he was driving rather than flying, where his daughter was, how many daughters he had, and the price of airfare from San Francisco to Boston, was not reasonable given all of the circumstances.  Mr. O'Boyle was not under arrest and the State conceded Trooper Peech did not have a reasonable suspicion of other criminal activity.  Yet, four minutes

into the stop, and before he was aware of Mr. O'Boyle's criminal history, Trooper Peech called for back-up assistance, specifically a canine unit. The unit arrived just two minutes later and parked directly behind the patrol car. By the time Trooper Peech returned Mr. O'Boyle's license and paperwork, issued the warning and told him to "have a safe trip," Mr. O'Boyle had been detained and subjected to persistent and sustained questioning that unreasonably expanded the scope of the stop far beyond the speeding offense into a full-blown drug investigation. At no time during this phase of the detention did Trooper Peech ask Mr. O'Boyle for his consent to this type of questioning or detention. Under all of the circumstances, the detention inside the patrol car was unreasonable and violated article 1, § 4 of the Wyoming Constitution.

In reaching this result, we consider not only *Vasquez* [*v. State*, 990 P.2d 476 (Wyo. 1999)] and the older Wyoming cases analyzing our search and seizure provision ([*State v. *]*George*, 231 P. [683, 688 (Wyo. 1924)]; [*State v. *]*Crump*, 246 P. [241, 244 (Wyo. 1926)]), we also consider matters of local and state concern. *Saldana* [*v. State*], 846 P.2d [604, 622 (Wyo. 1993)]. The State of Wyoming is bisected north and south and east and west by two major interstate highways. Interstate 80 provides drug traffickers with easy west to east access across the United States and is a well-known route for transporting drugs. DEA Microgram Bulletin, Vol. XXXVII, No. 9, September 2004; NDIC Narcotics Digest Weekly 2004; 3(35):3. The annual average daily traffic on I–80 near Cheyenne, where Mr. O'Boyle was stopped, is over 20,000 vehicles. 2002 Wyoming Vehicle Mile Book (WYDOT). Wyoming citizens operate a significant number of these vehicles. Traffic stops along I–80 are a routine part of the national drug interdiction program. "Although precise figures detailing the number of searches conducted pursuant to consent are not—and probably can never be—available, there is no dispute that these type of searches affect tens of thousands, if not hundreds of thousands, of people every year." Marcy Strauss, *Reconstructing Consent*, 92 Journal of Criminal Law and Criminology 211, 214 (2001–2002).

We previously have expressed disapproval of the use of traffic violations as a pretext to conduct narcotics investigations. *Damato v. State*, 64 P.3d 700, [706] (Wyo. 2003). In *Damato*, we joined in another state court's expression of concern about sanctioning conduct "where a police officer can trail a targeted vehicle with a driver merely suspected of criminal activity, wait for the driver to exceed the speed limit by one mile per hour, arrest the driver for speeding, and conduct a full-blown inventory search of the vehicle with impunity." *Id.* (citing *Arkansas v. Sullivan*, 532 U.S. 769, 771–772 (2001)). Our location along a nationally recognized drug trafficking corridor likely results in a disproportionately large percentage of Wyoming's comparatively small population being

> subjected to what have become routine requests to relinquish their privacy rights by detention, invasive questioning and searches—all without reasonable suspicion of criminal activity other than the offense giving rise to the stop. While we acknowledge the importance of drug interdiction, we are deeply concerned by the resulting intrusion upon the privacy rights of Wyoming citizens. This concern, considered together with Wyoming's traditional interpretation of article 1, § 4 as requiring reasonableness under all the circumstances, provides further support for our conclusion that the detention in this case violated the Wyoming Constitution.

*O'Boyle v. State*, 117 P.3d 401, 410–12 (Wyo. 2005).

In addition to achieving the same ends as the duration test, the investigative-scope test better aligns with Fourth Amendment principles. "When lines need to be drawn in creating rules, they should be drawn thoughtfully along the logical contours of the rationales giving rise to the rules, and not as artificial lines drawn elsewhere that are unrelated to those rationales." *State v. Gaskins*, 866 N.W.2d 1, 12–13 (Iowa 2015). One of the primary purposes of the Fourth Amendment is to limit the exercise of discretionary, arbitrary, or invasive use of law enforcement power. *See Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 613–14 (1989) (stating the Fourth Amendment "guarantees the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction"); *Delaware v. Prouse*, 440 U.S. 648, 653-54 (1979) ("The essential purpose of the proscriptions in the Fourth Amendment is to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions.'" (citation omitted)); *State v. Coleman*,___ WL ___, at *30 (Slip Opinion) ("[C]abining official discretion to conduct searches is designed to prevent

arbitrary use of police power."); *State v. King*, 867 N.W.2d 106, 123 (Iowa 2015) (stating the "purpose of search and seizure clauses" is to protect against "arbitrary invasions by government officials"); *State v. Ochoa*, 792 N.W.2d 260, 269–73 (Iowa 2010) (discussing historical context of enactment of Fourth Amendment); *State v. Thomas*, 540 N.W.2d 658, 662 (Iowa 1995) (holding the protection against unreasonable searches and seizures is a protection against "arbitrary police intrusion"); *State v. Height*, 91 N.W. 935, 939 (Iowa 1902) (discussing how the Fourth Amendment and article I, section 8 of the Iowa Constitution were intended to prevent the exercise of "arbitrary power").

What could be more arbitrary than allowing law enforcement officials to stop motorists at their complete discretion, *see State v. Pals*, 805 N.W.2d 767, 776 (Iowa 2011) (explaining the "potential abuse of traffic stops as nearly all vehicles, if followed for any substantial amount of time, commit minor traffic offenses that could serve as a springboard to" roadside detentions), and subject them to intrusive questioning so long as the questioning is done in an expeditious fashion? For example, in this case, the trooper detained Campbell to issue a warning for speeding but then asked Campbell numerous questions regarding his personal life, including the identity of the persons with whom Campbell lived, and whether the officer could call Campbell's future roommate in Ohio to confirm Campbell's travel plans. These questions were clearly unrelated to the speeding violation giving rise to the traffic stop. As one judge explained, the investigative-scope rule provides principled limitation on the exercise of law enforcement power:

> "[V]irtually, all thoughtful, civilized persons not overly steeped to the point of confusion in the mysteries of ... Fourth Amendment jurisprudence," *Royer*, 460 U.S. at 520 (Rehnquist, J., dissenting), would agree that the scope of a search or seizure must be part of the reasonableness inquiry. For if a man were stopped for speeding in Utah, it would not be reasonable for a police officer to ask whether he were practicing polygamy. There would be nothing in the circumstances to suggest any basis for such an inquiry even if the duration of the stop was not lengthened. The question itself would be an invasion of privacy. This is a good illustration why the duration of a traffic stop cannot be the only dimension of reasonableness. The subject-matter (or scope) dimension provides limits that are just as binding as the time (or duration) dimension.

*Childs*, 277 F.3d at 956 (Cudahy, J., dissenting).

The investigative-scope rule has much to commend it. It provides a principled limitation on the exercise of law enforcement discretion in accord with the core purpose of the Fourth Amendment. The investigative-scope rule draws a bright line. It gives law enforcement officials clear guidance on the scope of permissible conduct. It provides the citizenry with clear notice regarding the scope of rights upon detention. It provides the courts with a rule that can be applied consistently across cases and jurisdictions. Further, unlike the duration rule, it cannot be manipulated and massaged to further investigations unrelated to the justification for the stop. *See* Reid Bolton, *The Legality of Prolonged Traffic Stop After* Herring*: Brief Delays as Isolated Negligence*, 76 U. Chi. L. Rev. 1781, 1788 n.55 (2009) (noting departments "can potentially manipulate their procedures in order to create longer gaps between the beginning of the probable cause stop and the conclusion of the reasonable inquiry").

Despite the pedigree and advantages of such a rule, it is disallowed under present Fourth Amendment case law. Campbell has not raised a state law claim.

Campbell's challenge to the investigative scope of the roadside detention thus fails.

IV.

For the foregoing reasons, we conclude the Campbell was subjected to a roadside detention of unconstitutional duration. The unconstitutional duration of the stop led to the discovery of contraband in Campbell's vehicle. The contraband should have been suppressed as the result of an unconstitutional traffic stop. The district court erred in denying the defendant's motion to suppress evidence. We vacate the defendant's convictions and remand this matter for further proceedings.

**CONVICTIONS VACATED AND REMANDED.**