# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-1959
_____

United States of America

*Plaintiff - Appellee*

v.

Eleuterio Murillo-Salgado

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: November 17, 2016
Filed: April 13, 2017

_____

Before RILEY,[1] Chief Judge, WOLLMAN and KELLY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Eleuterio Murillo-Salgado was charged with one count of possessing cocaine with intent to distribute, 21 U.S.C. § 841(a)(1) and (b)(1)(B), after a Missouri State

_____

[1]The Honorable William Jay Riley stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 10, 2017. He has been succeeded by the Honorable Lavenski R. Smith.

Highway Patrol (MSHP) officer stopped a vehicle in which Salgado was a passenger and discovered cocaine hidden in an air-compressor tank during a search of the vehicle. The district court, adopting the report and recommendation of the magistrate judge, denied Salgado's motion to suppress the drug evidence. Salgado thereafter entered a conditional guilty plea, reserving his right to challenge the denial of his motion to suppress. The district court sentenced Salgado to sixty-three months' imprisonment and imposed a special condition of supervision ordering that Salgado be removed from the United States upon completion of his prison term. We affirm the order denying Salgado's motion to suppress. Because the district court lacked jurisdiction to enter the removal order, however, we amend the special condition of supervision to order that Salgado be surrendered to a duly authorized immigration official for removal proceedings upon completion of his prison term.

We have reviewed the video and audio recording of the traffic stop that the government introduced at the evidentiary hearing on Salgado's motion to suppress. We recite the facts as found by the magistrate judge and the district court, supplementing only where necessary to fully portray the encounter.

On the morning of April 7, 2014, MSHP Sergeant Larry Allen was patrolling Interstate 29 in Holt County, Missouri, when he observed a four-door Nissan truck traveling southbound in the left lane (but not passing other vehicles) and driving three miles over the posted speed limit. As he began to pursue the truck to initiate a traffic stop, Allen activated the safety lights on his patrol car, thereby triggering video and audio recording equipment.[2] The video recording time stamp indicates that the truck and the patrol car stopped on the shoulder of the highway at 10:39 a.m. As Allen approached the stopped truck, which bore California license plates, he observed a

_____

[2]The patrol car was equipped with video cameras that recorded activity both within and in front of the vehicle. In addition, Sergeant Allen was wearing a microphone that recorded audio during the traffic stop.

driver and a passenger in the front seats, some luggage and an air compressor in the back seat, and three packages of electrical wiring, a small ladder, a hard hat, and an "electrical type box" in the open truck bed. Allen spoke to the truck's occupants through the front passenger-side window. The driver identified himself as Ramon Arredondo, handed Allen a California driver's license, and told Allen that he and his passenger were driving from California to North Carolina. Allen instructed Arredondo to slow down and to use the left lane only for passing other vehicles, and then stated that he would issue a warning rather than a ticket. Allen asked Arredondo to exit the truck and accompany him to the patrol car while Allen completed necessary administrative tasks and wrote up the warning.

In the patrol car, Arredondo handed Allen a rental agreement and insurance information for the truck. Allen asked Arredondo what he and Salgado did for a living, as he simultaneously began entering Arredondo's information into the vehicle's computer. Arredondo responded that he and Salgado were electricians on their way to North Carolina for a big job that would pay "cool money." Allen, still typing information into the computer, then asked Arredondo why they were driving such a long distance instead of flying. Arredondo replied that they were transporting tools and all of the electrical wiring required for the job. Allen was suspicious of Arredondo's response because Allen did not believe that the quantity of electrical wiring he had seen in the truck bed was sufficient to complete a sizeable wiring job. Allen asked Arredondo if he had ever been arrested, and Arredondo replied that he had not. In response to Allen's question why the name on the rental agreement for the truck did not match the name on Arredondo's license, Arredondo pointed out that the agreement had mistakenly listed his middle name as his last name, and he expounded on similar past mix-ups. The two then spent several minutes discussing and paging through the rental agreement. Noting that the truck had been rented for only five days, Allen asked how Arredondo and Salgado could drive to North Carolina, complete the sizeable wiring job, and return the truck in California in only five days. Arredondo explained that he had been required to pay cash for the initial

rental and could afford to pay for only five days but that he intended to extend the rental period for a total of two weeks and to pay for the extension by credit card, as permitted under the agreement. He and Salgado would thus have sufficient time to drive to North Carolina, complete the wiring job, and return the truck in California. Allen asked whether it would have been less expensive to fly to North Carolina. Arredondo remarked that he had been in a traffic accident about a month earlier, described the accident in some detail, and stated that the other driver's insurance company was paying for the truck rental, a fact that had played a role in his decision to drive to North Carolina.

Allen asked Arredondo for his social security number, but Arredondo did not have that information. Allen again asked Arredondo whether he had been arrested and whether he had ever used or transported illegal drugs, to which Arredondo replied that he had not. Allen then called dispatch and provided Arredondo's name and date of birth for an outstanding-warrants check. A minute or so passed in silence while Allen waited for a reply from dispatch, and Allen then again asked Arredondo about the electrical wiring in the truck. Arredondo replied that he believed it was twelve-gauge wire and also stated that he was not actually an electrician but merely a "helper," who drilled holes for installation of the wiring. Allen then asked Arredondo who had rented the truck. Arredondo stated that he had and again explained that he would be reimbursed for the rental by an insurance company. The videotape reveals no signs of nervousness on Arredondo's part during these exchanges with Allen. Allen called dispatch again, informed the operator that he would be out of his patrol car for a brief period, and approached the parked truck to obtain information from the passenger. Arredondo remained in the patrol car.

As Allen approached the truck, he saw that the passenger was talking on a cell phone while, according to Allen, attempting to hide that fact. As they spoke through the open window, the passenger told Allen that he was on the phone with the contractor for the North Carolina wiring job. Allen asked the passenger to terminate

-4-

the call and provide his identification. The passenger identified himself as "Luther" and produced an expired Oregon driver's license in the name of Eleuterio Salgado. In response to Allen's questions, Salgado explained that he had lived in Oregon ten years earlier but had resided in California for the past six years. Allen asked Salgado when the truck had been rented and when he and Arredondo had left California. Salgado replied that they had rented the truck on Saturday and had left California Saturday evening at about 8:00 p.m. Salgado told Allen that Arredondo was his helper, that they chose to drive rather than to fly to North Carolina because they had to transport tools and materials, and that the job in North Carolina involved wiring a 15,000-square-foot residence. Allen asked who was paying for the truck rental, and Salgado replied that the contractor was reimbursing them for the expense. After learning that Salgado did not know his social security number, Allen returned to his patrol car to enter Salgado's information into the vehicle's computer and call dispatch to check for outstanding warrants.

Back in the patrol car, Allen asked Arredondo when he had left California, and Arredondo responded that they left Saturday evening. He told Allen that they had not driven all night, but had stopped at a Super 8 along the way. Arredondo then volunteered that it had been snowing when they stopped. Allen asked where the wiring job was located, and Arredondo responded that it was in Greensboro, North Carolina, and further offered that he had worked in West Virginia, Charleston, and North Carolina. He told Allen that he usually flew, but because an insurance company was paying for the rental truck, he had decided to drive on this occasion. Allen again asked who was paying for the truck, and Arredondo repeated that an insurance company was paying. During this exchange, Allen was typing information into his computer and talking to dispatch about Salgado's identity and record. Arredondo then began to describe the accident he had been in and the trouble he had been having with the other driver's insurance company, stating that he had retained an attorney to help resolve the matter. Allen again asked Arredondo whether there were any drugs, guns, or stolen items in the truck, and Arredondo again denied

having any such items. Allen asked who had loaded the truck, and Arredondo replied that he and Salgado had loaded the truck together. Allen received a brief call from dispatch, notifying him that Salgado did not have a valid driver's license and that he had a criminal record, including a drug-related offense. Allen continued to type on his computer for about a minute while Arredondo waited in silence.

Allen once again asked Arredondo whether there were any illegal drugs in the truck, going through a list of various drugs and receiving a negative reply from Arredondo regarding each substance. Finally, Allen asked Arredondo for permission to search the truck, which Arredondo consented to at 11:01 a.m., roughly twenty-three minutes after Allen had stopped the truck. Allen had not yet completed the tasks associated with the traffic stop or handed Arredondo the written warning upon obtaining Arredondo's consent to search, and so he asked whether Arredondo owned everything in the truck. Arredondo replied, "Just my clothes and everything else. Well, my clothes," which he stated were in two bags in the back seat of the truck. Arredondo denied owning any of the tools or tool boxes, but did state that he and Salgado owned the electrical wiring in the truck bed "collectively." While waiting for MSHP Sergeant Mark Wilhoit to arrive and assist with the search, Allen conducted a pat-down search of Arredondo and directed him to exit the patrol car and stand on the embankment along the shoulder of the highway.

Once Wilhoit arrived, Allen again approached the truck and asked Salgado about his criminal record. Salgado replied that it involved "a little cocaine." Allen then asked Salgado if there was any marijuana, cocaine, methamphetamine, or heroin in the truck, to which Salgado replied that there was not. Allen then opened the front passenger door of the truck, asked Salgado to get out of the vehicle. During his pat-down search of Salgado, Allen commented on the number of cell phones in Salgado's possession and the strong odor coming from the vehicle. Allen then directed Salgado to stand on the embankment with Arredondo. Allen did not ask Salgado for consent to search any of the items in the truck.

Wilhoit began to search in and under the truck's bed, and Allen began to search the passenger compartment. Upon opening the rear passenger door, Allen could more clearly see the air compressor in the back seat. Allen immediately identified the smell of fresh paint, as well as "some non-factory welding on the air tank . . . underneath the motor" of the compressor. Allen then stated, "Man, there is . . . something about this that just ain't right." Looking more closely at the air compressor as it sat on the truck's back seat, Allen commented to Wilhoit, "I think it's in here. I think it's in this air compressor." He further remarked on the rough and jagged welds, stating, "Come here and look, freshly painted, welded on, that ain't right." Allen noticed that there was "a square cut underneath the motor" that he believed provided "access [to] the air tank that was probably cut open at some point and packages put in." Without removing the air compressor from the truck, the officers tapped several times on the tank to determine whether it sounded hollow. Wilhoit then lifted the air compressor from the seat and hefted it several times in an attempt to determine if something inside the air tank would noticeably shift, commenting that the compressor felt heavier than it should. Wilhoit placed the compressor on the ground next to the truck and asked Allen to retrieve his "density buster," described by Allen as a "glorified stud finder," to use on the exterior of the tank. After applying the density buster to the exterior of the tank, Allen concluded that although the tank "ought to be hollow," the readings indicated that it was not. Allen and Wilhoit then placed the air compressor on the truck's now-open tailgate, Allen applied a stethoscope to the tank's exterior, tapped the tank in several spots, and determined from the resulting sounds that there was something inside.

Using a pair of pliers or similar tool, Wilhoit removed the "bleeder valve" petcock from the air tank, peered through the small hole into the tank itself, and saw gray or silver duct tape. Arredondo and Salgado were then placed under arrest, handcuffed, and advised of their <u>Miranda</u> rights. Wilhoit then inserted a probe through the petcock and into the silver duct tape visible within the air tank. When he removed the probe from the tank, it was covered in white powder, which the officers

both believed was cocaine. The air tank was eventually opened and several duct-taped packages of cocaine were recovered.

Salgado filed a motion to suppress the evidence recovered from the truck. The magistrate judge recommended that the motion be denied, concluding that the search of the truck and air compressor did not violate Salgado's Fourth Amendment rights. The magistrate judge reasoned that Allen developed reasonable suspicion to expand the scope of the routine traffic stop, that the warrantless search of the truck was lawful based on Arredondo's consent, and that the warrantless seizure of the air compressor was lawful based on the plain-view exception to the Fourth Amendment's warrant requirement. With respect to the warrantless search of the air compressor, the magistrate judge discussed the single-purpose-container exception to the Fourth Amendment, under which a warrantless search of certain containers is permissible because the contents of such containers "can be inferred from their outward appearance" and thus cannot support a reasonable expectation of privacy. United States v. Banks, 514 F.3d 769, 773-74 (8th Cir. 2008) (quoting Arkansas v. Sanders, 442 U.S. 753, 764-65 n.13 (1979), *overruled on other grounds by* California v. Acevedo, 500 U.S. 565 (1991)). The magistrate judge noted that Allen had "reasonable suspicion that the air compressor held evidence of a crime," particularly given that it was "heavier than normal" and "non-intrusive testing" indicated that "the tank was not hollow." The court then concluded that the officers had "probable cause to seize the air compressor" and, "applying the reasoning of *Banks*, . . . were justified in removing the pe[t]cock and searching the air compressor." Over Salgado's objections, the district court entered an order agreeing with the magistrate judge's "findings of fact and conclusions of law" and denying the motion to suppress.[3] Following the entry of Salgado's conditional guilty plea, the district court imposed

_____

[3]The district court made one modification to the report and recommendation to correct a typographical error.

the earlier described sentence of sixty-three months' imprisonment and the special condition of supervision ordering that Salgado be deported.

In a challenge to the denial of a motion to suppress, we review for clear error a district court's findings of fact, and we review *de novo* whether a search violated the Fourth Amendment. See United States v. Riley, 684 F.3d 758, 762 (8th Cir. 2012). We will affirm the denial of a motion to suppress unless the district court's decision was unsupported by substantial evidence, was based on an erroneous interpretation of applicable law, or was clearly mistaken in light of the entire record. United States v. Woods, 829 F.3d 675, 679 (8th Cir. 2016). "We may affirm the district court's denial of a motion to suppress on any ground the record supports." United States v. Anderson, 688 F.3d 339, 343 (8th Cir. 2012) (quoting United States v. Pratt, 355 F.3d 1119, 1121 (8th Cir. 2004)); see also United States v. Wells, 347 F.3d 280, 287-88 (8th Cir. 2003) (affirming denial of motion to suppress on basis of automobile exception rather than on basis of search incident to arrest relied on by district court).

Salgado concedes that there was probable cause to stop the truck for the traffic violations. He argues, however, that Allen prolonged the stop beyond the time reasonably required to investigate those violations and without reasonable suspicion of unrelated criminal activity, and thus exceeded the constitutional limitations on such stops set forth in the United States Supreme Court's post-April 7, 2014, decision in Rodriguez v. United States, 135 S. Ct. 1609 (2015).

In Rodriguez, an officer had completed the routine tasks incident to a traffic stop, including checking the driver's license and the vehicle's registration and proof of insurance, and had handed the driver a written traffic warning. Id. at 1613. Only after these routine tasks were completed and the warning issued did the officer request permission to search the vehicle. Id. When the driver refused to consent, the officer ordered the driver out of the vehicle and had him wait for a canine unit to

arrive. "All told, seven or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs. Id. The Supreme Court first acknowledged that an officer is permitted to "conduct certain unrelated checks during an otherwise lawful traffic stop," but reiterated that he "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id. at 1615. In other words, the Court explained, "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. at 1614. Because the traffic stop in Rodriguez "exceed[ed] the time needed to handle the matter for which the stop was made[, the stop] violate[d] the Constitution's shield against unreasonable seizures. Id. at 1612.

Our pre-Rodriguez case law similarly recognizes that an officer may detain the occupants of a vehicle during a traffic stop "while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation," including running a computerized check of the vehicle's registration and insurance; running a similar check of the occupants' identification documents and criminal histories; preparing the traffic citation or warning; and asking the occupants about their "destination, route, and purpose." United States v. Peralez, 526 F.3d 1115, 1119 (8th Cir. 2008) (citations omitted). If an officer encounters legitimate complications in completing these routine tasks, the officer "may reasonably detain a driver for a longer duration than when" no such complications arise. United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007). "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002). But the officer must identify "specific and articulable facts which, taken together with rational inferences from those facts," amount to reasonable suspicion that further investigation is warranted. Woods, 829 F.3d at 679 (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)). The totality of the circumstances are to be considered in determining whether reasonable suspicion existed. See id.

-10-

We concluded in <u>United States v. Peralez</u> that the traffic stop was unlawful because "[n]othing unusual occurred during the traffic stop" and "[t]here was nothing unusual or out of place with the [vehicle's] registration or the driver's documents" sufficient to justify extending the traffic stop. 526 F.3d at 1120. Rather, "[t]he stop was delayed because of the trooper's drug interdiction questioning, not because of anything related to the investigation or processing of the traffic violation." <u>Id.</u> Here, in contrast, Allen was faced with circumstances that, as a whole, were sufficient to establish reasonable suspicion necessary to justify extending the traffic stop.

Allen, who had received specific training in the trafficking of illegal drugs and had participated in "hundreds" of drug investigations, developed reasonable suspicion of drug-related activity while he was completing the routine tasks associated with the traffic stop. He first noticed a discrepancy between the name on Arredondo's driver's license and the name on the rental agreement. While further consulting the rental agreement to confirm the vehicle's registration and insurance information, he observed that the rental agreement was for a period of time that appeared insufficient to accomplish the stated purposes of the trip. Based on his admittedly limited electrical-wiring experience, Allen believed that the quantity of electrical wiring in the bed of the truck was insufficient in light of Arredondo's and Salgado's statements that they were transporting all of the wiring necessary to complete work on a 15,000-square-foot house. Arredondo first told Allen that he and Salgado were both electricians, and then later told Allen that he was Salgado's "helper." After Arredondo volunteered information about an earlier car accident and his expectation that the other driver's insurance company would pay for the truck rental, Allen attempted to verify this information with Salgado, receiving instead a conflicting response that the contractor on the North Carolina wiring job was paying for the truck rental.

The video recording of the roughly twenty-three-minute traffic stop indicates that Allen spent that time asking permissible questions of Arredondo and Salgado

regarding the purpose of their trip and their travel route, attempting to corroborate the responses to those questions, placing calls to dispatch, waiting for responses to verify Arredondo's and Salgado's identification and criminal history, and entering information into the patrol car's computer. Unlike the circumstances in Peralez, where "there was 'absolutely not' anything" about the motorist's actions or comments that caused the officer to be concerned that criminal activity was afoot when he began asking drug-interdiction questions, Allen could point to the factors set forth above to justify his reasonable suspicion that criminal activity was afoot. 526 F.3d at 1117. The traffic stop was not unlawfully prolonged given Allen's observations of the truck's contents, the seeming implausibilities and inconsistencies in the responses to Allen's routine questions, the reasonable suspicion Allen developed as a result of those improbable responses, as well as from Allen's independent observations. See id. at 1120 (acknowledging that "an officer may extend or expand the scope of a traffic stop beyond the original justification for the stop . . . . if the officer develops reasonable suspicion that other criminal activity is afoot"); United States v. McCarty, 612 F.3d 1020, 1023 (8th Cir. 2010) (noting that an officer's suspicion was reasonably aroused when a motorist "planned to maintain a very fast pace, having rented the car for only three days" to drive from Seattle to Atlanta, and when the cost of the rental "exceeded [the officer's] estimate of round-trip airfare").

We thus conclude that the traffic stop exceeded neither the constitutional boundaries set forth in our then-extant decisions nor those set forth in Rodriguez. To the extent that Rodriguez may be read to impose limitations greater than those reflected in our cases, we conclude that the evidence was nevertheless properly admitted, because "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." Davis v. United States, 564 U.S. 229, 232 (2011). Indeed, citing Davis, we upheld Rodriguez's conviction on remand. See United States v. Rodriguez, 799 F.3d 1222, 1223-24 (8th Cir. 2015), cert. denied, 136 S. Ct. 1514 (2016); see also United States v. Englehart, 811 F.3d 1034, 1040 n.1 (8th Cir. 2016) (reversing grant of motion to suppress because "we

apply the law of the circuit as it existed at the time of the stop," and "Eighth Circuit precedent at [that] time . . . permitted a *de minimis* extension of a stop to employ a dog"); United States v. Coleman, 700 F.3d 329, 335-36 (8th Cir. 2012) (concluding in pre-Rodriguez case that a traffic stop was permissibly prolonged when "additional questioning was brief, lasting only a couple of minutes" and noting that we "have upheld such short detentions as de minimis intrusions"); United States v. Robinson, 455 F.3d 832, 834 (8th Cir. 2006) (noting in pre-Rodriguez case that seizures of less than ten minutes are *de minimis* intrusions that do not amount to an unreasonable seizure and citing cases).

Because the traffic stop was not impermissibly expanded or prolonged, Arredondo's consent to search the truck was valid, the continued detention to search the truck pursuant to that consent was permissible, and the ensuing search of the truck was lawful. See Peralez, 526 F.3d at 1120 (recognizing that an officer may extend or expand the scope of a traffic stop if the encounter becomes consensual); United States v. Barragan, 379 F.3d 524, 529-30 (8th Cir. 2004) (noting that a mere passenger who has no ownership rights in a vehicle has no standing to challenge a search of that vehicle). Salgado argues, however, that even if the search of the truck itself was a lawful consensual search, the search of the air compressor was not, because Arredondo's consent could not have extended to the air compressor, over which he had specifically disclaimed ownership. Salgado further contends that even if the district court properly concluded that the seizure of the air compressor was lawful under the plain-view exception to the Fourth Amendment's warrant requirement, the court erred in concluding that the search of the air compressor was lawful under the single-purpose-container exception to the warrant requirement, which permits the warrantless search of certain containers where the contents of the container are a foregone conclusion. See Banks, 514 F.3d at 773-74 (noting that, like objects in plain view, there is no reasonable expectation of privacy attendant to certain closed containers because the contents of the container may be inferred from the container's outward appearance); see also United States v. Corral, 970 F.2d 719,

725 (10th Cir. 1992) (noting that when a container's "'distinctive configuration . . . proclaims its contents,' the container supports no reasonable expectation of privacy and the contents can be said to be in plain view" (citations omitted)).

We need not belabor the district court's reliance on the single-purpose-container exception to justify the warrantless search of the air compressor, because the search was permissible under the automobile exception to the Fourth Amendment's warrant requirement. See, e.g., Wells, 347 F.3d at 287 ("It is a well-settled principle that we may affirm a district court's judgment on any basis supported by the record." (citation omitted)).

A warrantless search of an automobile for contraband is allowed under the Fourth Amendment if an officer has probable cause to justify the search, see generally United States v. Ross, 456 U.S. 798, 825 (1982), or if the officer has obtained voluntary consent, provided that the search is limited to the scope of the consent, Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."). Observations made by an officer during a consensual search of a vehicle may provide the officer with probable cause to expand the scope of the search under the automobile exception. See United States v. Guevara, 731 F.3d 824, 829-31 (8th Cir. 2013) (concluding that when officers conducting a consensual search of a lawfully stopped vehicle discovered a hidden compartment in the vehicle's engine, they no longer needed consent to conduct a destructive search of the engine because they then had probable cause); United States v. Alverez, 235 F.3d 1086, 1089 (8th Cir. 2000) (concluding that when officers conducting a consensual search of a disabled vehicle moved cardboard in the trunk, discovered a usable spare tire, and knew that motorists had slept in the car during an ice storm while waiting to obtain tire sealant, officers had probable cause to remove the tire and examine it more closely for contraband). "Probable cause exists when, given the totality of the circumstances, a reasonable

-14-

person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." Wells, 347 F.3d at 287 (citation omitted); see Florida v. Harris, 133 S. Ct. 1050, 1055 (2013) ("A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." (internal quotation, alterations, and citation omitted)). Probable cause is a "practical and common-sensical standard" that is based on "the totality of the circumstances" and requires only "the kind of fair probability on which reasonable and prudent people, not legal technicians, act." Id. (internal quotations, alterations, and citations omitted). Moreover, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search," Ross, 456 U.S. at 825, including a passenger's personal belongings, Wyoming v. Houghton, 526 U.S. 295, 302 (1999). In determining whether probable cause exists, an officer "may draw inferences based on his own experience." Ornelas v. United States, 517 U.S. 690, 700 (1996).

Allen began his search pursuant to Arredondo's voluntary consent, which entitled Allen to search all areas of the truck, including the passenger compartment where the air compressor was located. Allen's detection of the odor of fresh paint, his unimpeded observation of fresh paint on the air compressor's tank and the rough, jagged, non-factory welds on the motor-attaching bracket and on the air tank itself, gave him probable cause to believe "that contraband or evidence of a crime [was] present." Harris, 133 S. Ct. at 1055. The totality of the circumstances—coupled with Allen's training and experience in "hundreds" of drug investigations—provided "a fair probability" from the moment Allen observed the air compressor that the truck held "contraband or evidence of a crime." Harris, 133 S. Ct. at 1055. Accordingly, under the automobile exception to the warrant requirement, Allen was permitted to search "every part of the vehicle and its contents" that could conceal drug-related contraband, including the air compressor. Ross, 456 U.S. at 825; Houghton, 526 U.S. at 302. We thus affirm the denial of the motion to suppress.

-15-

Salgado also argues that the district court exceeded its authority under 18 U.S.C. § 3583(d) when it ordered that he be removed as a special condition of supervision.  See, e.g., United States v. Tinoso, 327 F.3d 864, 865 (9th Cir. 2003) ("agree[ing] with . . . the First, Second, Fourth, Fifth, Tenth, and Eleventh Circuits . . . that a district court exceeds its authority in ordering, as a condition of supervised release, immediate and automatic deportation without a deportation hearing" and citing cases).  Unless the prosecutor and immigration officials request that the district court hold a removal hearing, only an immigration judge may order an individual removed.  See United States v. Zamudio, 718 F.3d 989, 990 (7th Cir. 2013).  There having been no such request in this case, the government concedes that the court exceeded its authority in entering the removal condition.  Accordingly, we modify the judgment of the district court to reflect the following Special Condition of Supervision 1:

> 1.  Upon completion of his term of imprisonment, the defendant shall be surrendered to a duly authorized immigration official for removal in accordance with the procedures set forth in the Immigration and Naturalization Act, 8 U.S.C. §§ 1101-1524.

See United States v. Sanchez, 923 F.2d 236, 238 (1st Cir. 1991) (concluding that district court exceeded its authority in ordering defendant deported, but declining to remand for resentencing and instead amending judgment); see also  United States v. Phommachanh, 91 F.3d 1383, 1388 (10th Cir. 1996) (amending the judgment); United States v. Xiang, 77 F.3d 771, 773 (4th Cir. 1996) (same).

As modified, the judgment is affirmed.

KELLY, Circuit Judge, dissenting.

In my view, the evidence recovered from the truck should have been suppressed because both the extension of the traffic stop and the search of the air

-16-

compressor violated Murillo-Salgado's Fourth Amendment rights. If an officer asks questions unrelated to the purpose of a traffic stop that extend the stop's duration—even briefly—the extension must be supported by reasonable suspicion. Rodriguez, 135 S. Ct. at 1614–15. Here, Allen interspersed routine traffic-stop questions with investigatory questions that had nothing to do with the reason he pulled the truck over. This "blended process" measurably extended the stop: From the time Allen told Arredondo he would give him a warning to the time Arredondo consented to the search of the truck, more than twenty minutes passed. See Peralez, 526 F.3d at 1121 (concluding that blended questioning prolonged a stop where the officer interpersed routine and off-topic questions for thirteen minutes after telling the driver he would receive a warning).

The court concludes that the extension of the stop was justified by reasonable suspicion, citing a variety of circumstances that arose over the course of the stop. But the key question is whether Allen had reasonable suspicion *before* he extended the stop with off-topic questions. See United States v. Hollins, 685 F.3d 703, 706 (8th Cir. 2012) (explaining that the determination of whether "reasonable suspicion 'existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time'" (quoting United States v. Sanders, 196 F.3d 910, 913 (8th Cir. 1999))). The extension of the stop by off-topic questions occurred—at the latest—by the time Allen left Arredondo in the cruiser and approached Murillo-Salgado. At that point, Allen had been questioning Arredondo for approximately ten minutes, and had asked numerous off-topic questions, including questions about the cost of plane tickets to North Carolina, the wiring job, and whether Arredondo had ever used or transported drugs. During the suppression hearing, Allen identified only two circumstances that he found "suspicious" prior to that point: the fact that the rental agreement transposed Arredondo's middle and last

names, and the fact that the rental agreement was for only five days.[4]  See United States v. Horton, 611 F.3d 936, 940 (8th Cir. 2010) ("Th[e reasonable suspicion] standard requires that officers be able to point to specific, articulable facts justifying the seizure.").  But Allen did not explain why those minor irregularities—which Arredondo explained without hesitation—gave rise to a rational inference that Arredondo and Murillo-Salgado were transporting drugs.  See United States v. Jones, 269 F.3d 919, 928 (8th Cir. 2001) (concluding that inconsistencies in a driver's answers to an officer did not support reasonable suspicion because the officer identified no "connection between [the] inconsistent answer . . . and suspicion of interstate narcotics trafficking").  Thus, I would hold that the extension of the stop was an unconstitutional seizure.

Even if there was reasonable suspicion to prolong the stop, I do not believe there was probable cause to search the air compressor.  The court concludes that probable cause existed because Allen observed fresh paint and jagged welding on the air compressor.  But although such circumstances might have given rise to an inference that the air compressor had been repaired or modified, they did not establish "a fair probability" that the air compressor contained contraband.  Nor could Allen's training and experience add to the probable-cause calculus:  He never testified that he was trained on the use of air compressors to smuggle narcotics, or that he had ever—in hundreds of drug investigations—found narcotics in an air compressor before.  See United States v. Johnson, 171 F.3d 601, 604 (8th Cir. 1999) (determining that a postal inspection officer did not have reasonable suspicion that a package contained contraband because although he had training and experience, "there was

---

[4]Allen offered no testimony suggesting that he found it suspicious that Arredondo first said he and Murillo-Salgado were both electricians, and later said he was a helper and Murillo-Salgado was an electrician.  And to the extent Allen suggested that he found the amount of electrical wire in the truck to be suspicious, his testimony establishes that he developed such suspicion only after speaking with Murillo-Salgado, who told him they would be rewiring a 15,000 square-foot mansion.

-18-

no articulation of how the officer's experience bore upon his appraisal of the package").  Accordingly, I would hold that the search of the air compressor was unconstitutional.  For these reasons, I respectfully dissent.

_____