# IN THE SUPREME COURT OF IOWA

No. 18–1353

Filed November 8, 2019

**STATE OF IOWA,**

Appellee,

vs.

**JUAN DANIEL SALCEDO,**

Appellant.

Appeal from the Iowa District Court for Johnson County, Patrick R. Grady, Judge.

A defendant challenges the district court's denial of his motion to suppress. **REVERSED AND REMANDED.**

Sean P. Spellman and Mary K. Spellman of Spellman Law, P.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven, Assistant Attorney General, Janet M. Lyness, County Attorney, and Elizabeth Beglin, Assistant County Attorney, for appellee.

**CHRISTENSEN, Justice.**

The defendant was stopped for violating Iowa Code section 321.297(2) (2017). That section provides, "Any vehicle proceeding at less than the normal speed of traffic at the time and place and under the conditions then existing shall be driven in the right-hand lane then available for traffic upon all roadways . . . ." The deputy asked defendant and his passenger questions and found their answers suspicious. In response to drug interdiction questions, defendant indicated, "You can do what you got to do." The deputy sought further permission for a consent search. Within fourteen minutes of being pulled over, he consented.

After conducting a full search of defendant's car, the deputy located over eighty pounds of marijuana in the trunk. Defendant was arrested and charged with possession of marijuana with intent to deliver. Defendant filed a motion to suppress all evidence stemming from the stop. The district court denied defendant's motion in its entirety.

We granted defendant's application for discretionary review. On review, defendant raises four issues: (1) whether the deputy obtained reasonable suspicion of other criminal activity in order to permit the prolonged detention, (2) whether his consent to search was voluntary, (3) whether Iowa Code section 321.297(2) is void for vagueness, and (4) whether probable cause existed for the traffic stop.

Upon review, we reverse the district court's judgment as to whether the deputy developed reasonable suspicion of other criminal activity before unreasonably prolonging the stop. Consequently, we need not address the other issues.

## I. Background Facts and Proceedings.

Deputy Sheriff Cody O'Hare of the Johnson County Sheriff's Office was traveling eastbound on Interstate 80 in response to a reported reckless

driver. It was approximately 9:00 p.m. on November 2, 2017, when Deputy O'Hare—en route to that call—encountered a different car traveling in the left lane of Interstate 80's two eastbound lanes. Deputy O'Hare's attention was drawn to this car because, despite the deputy's approach, the car did not move to the right-hand lane to let him pass. Deputy O'Hare testified he approached the car in the left lane, the same lane as his direction of travel. Deputy O'Hare was informed by dispatch that the car was a rental. The posted speed limit on this stretch of interstate was seventy miles per hour. Deputy O'Hare was traveling about seventy-five miles per hour in response to the dispatch call. He estimated the car was traveling approximately sixty miles per hour in the seventy miles-per-hour zone.

Deputy O'Hare testified he was forced to move to the right-hand lane. He paced the car for three miles at approximately two car lengths behind the car. The car remained in the left most lane throughout the duration of Deputy O'Hare's pacing, even when Interstate 80 became three eastbound lanes. No other traffic, weather, or condition made it unsafe for the car to move to the right-hand lane.

Deputy O'Hare switched back to the left most lane, followed the car for a moment, and then initiated a traffic stop for violation of Iowa Code section 321.297(2). The car complied without difficulty. At approximately 9:05 p.m., Deputy O'Hare approached the passenger side of the car. He explained he initiated the stop for driving too slow in the left-hand lane and asked the driver for his license and rental car agreement. Due to the loud interstate traffic and cold November weather, Deputy O'Hare asked the driver to accompany him back to the patrol car. The driver indicated he had no weapons on him and allowed Deputy O'Hare to conduct a pat-down search when requested to do so. Following that pat-down, the driver

let himself into the unlocked front seat passenger door of the patrol car. It was approximately 9:06 p.m.

The driver identified himself as Juan Salcedo. Deputy O'Hare initiated a conversation with Salcedo and asked about his travel plans. Salcedo explained he was driving back from California after visiting his girlfriend. Salcedo further explained his home was New York City and he and the passenger, who Salcedo identified as his cousin, were traveling together. Deputy O'Hare repeatedly thumbed through the rental car agreement. In response to Salcedo's questioning about the reason for the stop, Deputy O'Hare said there was no reason for Salcedo to be driving in the fast lane. The conversation continued while Deputy O'Hare again quickly and repeatedly flipped through the rental car agreement. Salcedo stated he initially flew from New York to Florida and then flew from Florida to California. Salcedo and his cousin rented a car in California to drive back to New York City. It appeared, based on the body camera footage, that Deputy O'Hare put forth no effort to process the traffic infraction.

Within seven minutes of Salcedo being pulled over, another patrol car arrived and Deputy O'Hare exited his car to speak with Deputy Lenz. Salcedo remained in the front seat of Deputy O'Hare's car. Deputy O'Hare's body camera leaves no doubt that he was quite disappointed to learn a drug dog was not available. He briefly explained Salcedo's travel plans to Deputy Lenz, indicated he was going to ask for a consent search, and then asked Deputy Lenz to watch Salcedo while he verified the travel details with the passenger.

Deputy O'Hare asked for the passenger's identification, which the passenger provided, and identified him as Jairo Rodriguez. Rodriguez confirmed the travel plans outlined by Salcedo but indicated Salcedo's girlfriend, who was not present, actually signed the rental agreement.

Deputy O'Hare noted the presence of three cell phones for a car containing only two people. He also observed the back seat of the rental car contained "a lot of luggage." Deputy O'Hare asked Rodriguez if all of their personal property was situated in the back seat, to which Rodriguez responded it was. At the suppression hearing upon cross-examination, Deputy O'Hare testified he noticed these red flags "right away" from his initial observation of the rental car but only further inquired about them while speaking with Rodriguez.

Rodriguez remained in the passenger seat of the rental car while Deputy O'Hare returned to his patrol car to speak with Salcedo. Deputy O'Hare asked further questions about the rental car, and Salcedo clarified it was his girlfriend who signed the rental agreement because it was more cost effective to rent the car to someone over the age of twenty-five. Salcedo explained more of his travel details and then Deputy O'Hare asked Salcedo if he was transporting any weapons of mass destruction. Salcedo answered in the negative and stated, "No. You can do what you got to do." Salcedo was also asked if he was transporting any marijuana. He answered, "No. You can go . . . you can go do what you got to do." Deputy O'Hare testified he understood Salcedo's answers to mean Salcedo was allowing a search of the rental car. Deputy O'Hare continued and asked about the presence of heroin, methamphetamine, and large amounts of cash. Salcedo answered no to each, except that he was carrying $300 in cash. Deputy O'Hare asked, "You said we can search the vehicle then?" Salcedo responded, "Yeah, you can do what you got to do. There is no reason . . . I don't have no reason to . . . ."

Salcedo remained in the passenger seat of the patrol car while Deputy O'Hare approached the rental car. It was approximately 9:19 p.m., fourteen minutes after Salcedo was pulled over. Deputy O'Hare advised

Rodriguez of Salcedo's consent to the search and asked Rodriguez to step out of the car. Rodriguez also consented to the search of his personal property when asked by Deputy O'Hare, and he remained outside the rental car.

Deputy O'Hare conducted a full search of the rental car, and in the trunk he found garbage bags containing eighty-two pounds of marijuana. Salcedo and Rodriguez were then arrested.

The State's two-count trial information charged Salcedo and Rodriguez with possession of marijuana with intent to deliver in violation of Iowa Code section 124.401(1)(*d*) and failure to affix drug tax stamp in violation of Iowa Code chapter 453B.

Salcedo entered a plea of not guilty and later filed a motion to suppress all evidence stemming from the stop. His motion asserted Deputy O'Hare lacked probable cause or reasonable suspicion for the stop, Iowa Code section 321.297 is unconstitutionally void for vagueness, his continued and prolonged detention violated Federal and Iowa Constitutions, and his consent to search was not voluntarily given.

Deputy O'Hare testified at the suppression hearing. Videos from his body camera and patrol car camera were admitted into evidence. Deputy O'Hare explained his drug interdiction training courses. As a result of this training, Deputy O'Hare knew California was a common entry point for illegal drugs. With respect to drug runners, he also knew "[a] lot of times you see them using rental cars." Deputy O'Hare testified that it would take him "[p]robably anywhere from 10 to 20, 25 minutes" to complete a run-of-the-mill traffic stop. He further admitted, throughout the duration of Salcedo's traffic stop, he never asked Salcedo any specific questions about the traffic infraction.

Deputy O'Hare admitted that it was his intention to investigate issues other than the traffic infraction. He based this view on the fact that "it was a rental vehicle, the three phones, luggage in the back seat, and it becoming a third-party rental." Deputy O'Hare explained generating traffic citations required entering information into the computer. In response to whether he had ever entered Salcedo's information into the computer, Deputy O'Hare stated, "No. I was never—never entered information into a traffic citation."

After the suppression hearing, the district court denied Salcedo's motion to suppress. It determined section 321.297(2) was not vague and found reasonable and articulable suspicion existed that a traffic law was violated. It also found the stopping deputy received a valid consent to search the stopped car.

Salcedo sought discretionary review of the district court's order denying his motion to suppress. We granted his application for discretionary review.

## II.  Standard of Review.

A district court's denial of a motion to suppress based on the depravation of a constitutional right is reviewed de novo. *State v. Coleman*, 890 N.W.2d 284, 286 (Iowa 2017). "This review requires 'an independent evaluation of the totality of the circumstances as shown by the entire record.' " *State v. Pals*, 805 N.W.2d 767, 771 (Iowa 2011) (quoting *State v. Turner*, 630 N.W.2d 601, 606 (Iowa 2001)). "In doing so, we give deference to the factual findings of the district court due to its opportunity to evaluate the credibility of the witnesses, but are not bound by such findings." *State v. Lane*, 726 N.W.2d 371, 377 (Iowa 2007).

**III. Analysis.**

Salcedo raises several challenges to the district court's denial of his motion to suppress. First, Salcedo argues the scope and duration of his stop were impermissibly extended absent reasonable suspicion of other criminal activity. Second, Salcedo maintains he did not voluntarily consent to the search of his car. Third, Salcedo claims Iowa Code section 321.297(2) offends due process because it is impermissibly vague. Lastly, Salcedo contends he did not violate Iowa Code section 321.297(2) and there was no probable cause for the stop. We address these issues as necessary.

We first address Salcedo's challenge to the scope and duration of his traffic stop. Salcedo argues the scope and duration of his stop were impermissibly extended by questions unrelated to the purpose of the underlying traffic infraction. He raised his claim under the Federal and Iowa Constitutions in the district court and urges this court to construe article I, section 8 of the Iowa Constitution in a "broad and liberal spirit." He contends any request for a consent search, absent reasonable suspicion of criminal activity, is in violation of the Iowa Constitution. The State argues Deputy O'Hare developed reasonable suspicion at the start of the traffic stop, permitting expansion of its scope and duration.

Article I, section 8 guarantees the right to be secure against unreasonable searches and seizures, and it contains language nearly identical to the Fourth Amendment counterpart. *See State v. Short*, 851 N.W.2d 474, 500–01 (Iowa 2014). *Compare* Iowa Const. art. I, § 8, *with* U.S. Const. amend. IV. "When both federal and state constitutional claims are raised, we may, in our discretion, choose to consider either claim first in order to dispose of the case, or we may consider both claims simultaneously." *State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010).

In this case, we need not reach Salcedo's challenge to the scope and duration of the stop based on article I, section 8 of the Iowa Constitution. *See In re Prop. Seized from Pardee*, 872 N.W.2d 384, 391 & n.6 (Iowa 2015). Deputy O'Hare failed to obtain individualized suspicion of other criminal activity before unreasonably prolonging the stop. The unreasonableness of the stop was in violation of Salcedo's Fourth Amendment rights.

The detention of an individual during a traffic stop, even if brief and for a limited purpose, is a seizure within the meaning of the Fourth Amendment. *See State v. Kreps*, 650 N.W.2d 636, 641 (Iowa 2002). This seizure, consistent with the constitutional requirement, must be reasonable under the circumstances. *Id.* "[I]t is well settled that a traffic violation, however minor, gives an officer probable cause to stop a motorist" and is therefore a reasonable seizure. *State v. Aderholdt*, 545 N.W.2d 559, 563 (Iowa 1996). We assume without deciding that Salcedo's failure to yield the left-hand lane, which is conduct prohibited by Iowa Code section 321.297(2), provided probable cause to initiate the stop. Thus, the initial detention of Salcedo was reasonable.

Once lawfully stopped, inquiries reasonably related to the mission of addressing the traffic infraction "and attend[ing] to related safety concerns" are permissible. *See Rodriguez v. United States*, 575 U.S. ___, ___, 135 S. Ct. 1609, 1614 (2015); *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 837 (2005); *Aderholdt*, 545 N.W.2d at 563–64. This court has recognized, "[A] reasonable investigation includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." *Aderholdt*, 545 N.W.2d at 563–64 (quoting *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc)); *see United State v. Murillo-Salgado*, 854 F.3d 407, 414–15 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 245 (2017); *see also*

*Rodriguez*, 575 U.S. at \_\_\_, 135 S. Ct. at 1615 ("Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" (alteration in original) (quoting *Caballes*, 543 U.S. at 408, 125 S. Ct. at 837)); *Delaware v. Prouse*, 440 U.S. 648, 658–59, 99 S. Ct. 1391, 1398–99 (1979) (license and registration checks ensure safe operation of vehicles). Ultimately, the mission of the stop is to address the traffic infraction and "may 'last no longer than is necessary to effectuate th[at] purpose.'" *Rodriguez*, 575 U.S. at \_\_\_, 135 S. Ct. at 1614 (alteration in original) (quoting *Florida v. Royer*, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325 (1983) (plurality opinion)).

The reasonable investigation, however, may be expanded to satisfy suspicions of criminal activity unrelated to the traffic infraction based upon responses to reasonable inquires. *Aderholdt*, 545 N.W.2d at 564. "But the officer must identify 'specific and articulable facts which, taken together with rational inferences from those facts,' amount to reasonable suspicion that further investigation is warranted." *Murillo-Salgado*, 854 F.3d at 415 (quoting *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016)). We evaluate the existence of reasonable suspicion based on the totality of circumstances confronted by the officer. *See State v. McIver*, 858 N.W.2d 699, 702 (Iowa 2015).

This is not to say law enforcement may prolong a stop indefinitely. They clearly may not. *See Pardee*, 872 N.W.2d at 397. Our decision in *Pardee* applied recent Supreme Court precedent to address whether, consistent with the Fourth Amendment, an Iowa trooper "developed reasonable suspicion of other criminal activity—if at all—only by prolonging the initial stop beyond the time reasonably necessary to execute the traffic violation warnings." *Id.* at 391. *Pardee* compared and contrasted a number of federal circuit court cases weighing reasonable

suspicion. *See id.* at 393–96 (discussing in order *United States v. Briasco*, 640 F.3d 857 (8th Cir. 2011); *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998); *United States v. Evans*, 786 F.3d 779 (9th Cir. 2015); and *United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008)). We determined individualized suspicion of criminal activity did not exist at the outset of the stop when the trooper first encountered the vehicle's occupants. *Id.* at 395. We then concluded the twenty-five minute traffic stop was prolonged within the meaning of *Rodriguez*. *Id.* at 396. Lastly, we held reasonable suspicion did not exist within the time necessary to address the traffic infraction. *Id.* at 396–97.

*Pardee* reiterated the rule set forth in *Rodriguez*: "Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 392 (quoting *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614). *Rodriguez* made clear the Fourth Amendment will tolerate certain unrelated investigations that do not extend the roadside stop, but the stop will remain lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop." *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1615 (alteration in original) (quoting *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 788 (2009)). Addressing the traffic infraction is the purpose of the stop and "it may 'last no longer than is necessary to effectuate th[at] purpose.'" *Id.* at ___, 135 S. Ct. at 1614 (alteration in original) (quoting *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325).

Salcedo argues his stop was prolonged beyond what was reasonably necessary to resolve his traffic infraction, absent reasonable suspicion of other criminal activity. The State asserts Deputy O'Hare developed reasonable suspicion of criminal activity while speaking with Salcedo and points to a number of factors in support of its position. We conclude

Deputy O'Hare failed to develop individualized suspicion of other criminal activity before unreasonably prolonging the stop.

At the outset of the stop, Deputy O'Hare knew Salcedo's car was a California rental. However, it is not clear when Deputy O'Hare observed the three cell phones and luggage. Initially, Deputy O'Hare stated he viewed the "red flags" on his second trip to the rental car but then later clarified that he observed them "right away." Regardless, even assuming Deputy O'Hare was aware of the red flags when he first approached the rental car, they do not provide reasonable suspicion of criminal activity. *See Beck*, 140 F.3d at 1137 (car rented by a third party not present, licensed in California, presence of fast-food wrappers, no luggage in passenger compartment, nervous demeanor of motorist, trip from drug-source state to drug-demand state, and disbelief of travel plans did not generate reasonable suspicion).

The same lack of reasonable suspicion persisted after Deputy O'Hare initially conversed with Salcedo. Salcedo explained he was driving back to New York after flying to California. Deputy O'Hare noted Salcedo's travel plans were odd and another potential red flag of drug trafficking. During the conversation, Salcedo asked why he was pulled over, and Deputy O'Hare indicated there was no reason to drive in the fast lane. Meanwhile, Deputy O'Hare continued to quickly and repeatedly thumb through Salcedo's rental agreement but did not inquire about the party that signed the agreement. Interestingly, the body camera revealed Deputy O'Hare's surprise when he learned from Rodriguez that the rental agreement was signed by a nonpresent third party. Only after Rodriguez explained the rental agreement did Deputy O'Hare return to Salcedo a second time and inquire into the agreement. At the conclusion of the first conversation with Salcedo, the only additional factor Deputy O'Hare developed as a possible

red flag of other criminal activity was Salcedo's odd travel plans. This factor, combined with the previous factors, did not provide Deputy O'Hare with reasonable suspicion of other criminal activity. *See Beck*, 140 F.3d at 1137; *cf. Briasco*, 640 F.3d at 860 (reasonable suspicion created by luggage in back seat, strong odor of air freshener, back of vehicle squatting from excessive weight, one-way rental car, nervousness of motorists). We cannot conclude Deputy O'Hare developed reasonable suspicion of other criminal activity after his first conversation with Salcedo.

Absent reasonable suspicion after Salcedo's first conversation, we must now determine whether Deputy O'Hare unreasonably prolonged the stop. It was approximately 9:05 p.m. when Deputy O'Hare initiated Salcedo's traffic stop. Shortly after 9:06 p.m., Salcedo let himself into the patrol car to speak with Deputy O'Hare. It is permissible for Deputy O'Hare to make reasonable inquiries to address the traffic infraction and "attend to related safety concerns." *See Rodriguez*, 575 U.S. ___, 135 S. Ct. at 1614. In fact, "an officer may detain the occupants of a vehicle during a traffic stop 'while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation.'" *Murillo-Salgado*, 854 F.3d at 415 (quoting *Peralez*, 526 F.3d at 1119). An officer may "run[] a computerized check of the vehicle's registration and insurance; run[] a similar check of the occupants' identification documents and criminal histories; prepar[e] the traffic citation or warning; and ask[] the occupants about their 'destination, route, and purpose.'" *Id.* (quoting *Peralez*, 526 F.3d at 1119). However, absent reasonable suspicion of other criminal activity, the officer's mission is to address the traffic infraction and that mission may take no longer than is necessary. *See Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614.

What becomes immediately apparent is Deputy O'Hare's complete lack of effort to address Salcedo's specific traffic infraction. Six minutes elapsed from the time Salcedo entered the patrol car to the time Deputy O'Hare departed to speak with Deputy Lenz. Deputy O'Hare admitted that, throughout the duration of the stop, he did not ask Salcedo questions regarding the traffic infraction. The body camera revealed Deputy O'Hare repeatedly thumbing through the rental agreement. There does not appear to be any attempt to gain understanding of the document. To the contrary, the incessant page flipping appears to be a stalling tactic to keep the conversation going until a drug dog arrived. During this time, he did not attempt to run a check of Salcedo's identifying documents or criminal histories, and he did not prepare a traffic citation or warning. Deputy O'Hare admitted, "I was never—never entered information into a traffic citation."

The body camera further supports Salcedo's position that Deputy O'Hare was stringing along the stop until a drug dog arrived. Shortly after Salcedo entered the patrol car, Deputy O'Hare requested assistance. When Deputy Lenz arrived, Deputy O'Hare was immediately disappointed to learn a drug dog was not available. Deputy O'Hare also testified at the suppression hearing that he knew from the time of the stop that he would be investigating issues other than the traffic infraction.

We conclude the constitutionally permissible traffic stop became unlawful when it was unreasonably prolonged. *See Peralez*, 526 F.3d at 1120 (holding stop was delayed because of trooper's questions, "not because of anything related to the investigation or processing of the traffic violation"). Deputy O'Hare's mission is to address Salcedo's traffic infraction and it may last no longer than is reasonably necessary to complete the mission. *Rodriguez*, 575 U.S. at ___, 135 S. Ct. at 1614. The

Fourth Amendment will tolerate certain unrelated investigations that do not extend the roadside stop, but the stop will remain lawful only "so long as [unrelated] inquiries do not measurably extend the duration of the stop." *Id.* at \_\_\_, 135 S. Ct. at 1615. (alteration in original) (quoting *Johnson*, 555 U.S. at 333, 129 S. Ct. at 788). After speaking with Salcedo, it appeared Deputy O'Hare was no closer to completing the mission of the traffic stop than he was prior to inviting Salcedo into his patrol car. The delay of Salcedo's stop was measurable, unreasonable, and in violation of his Fourth Amendment rights. *See id.*

## IV. Conclusion.

For the aforementioned reasons, we reverse the district court's judgment as to whether the deputy developed reasonable suspicion of other criminal activity before unreasonably prolonging the stop. Because we reverse the district court's judgment denying Salcedo's motion to suppress, we need not address the other issues.

**REVERSED AND REMANDED.**