**STATE of Iowa, Appellant,**

v.

**John Thomas ADERHOLDT and Christopher Craig Thaemert, Appellees.**

No. 95–457.

Supreme Court of Iowa.

March 20, 1996.

Thomas J. Miller, Attorney General, Susan M. Crawford, Assistant Attorney General, Brent Symens, County Attorney, and Kathleen Selzler, Assistant County Attorney, for appellant.

John G. Sorensen, Clear Lake, and John L. Sesini of Brennan, Ramirez, Wilmouth & Sesini, Milwaukee, Wisconsin, for appellee John Thomas Aderholdt.

James A. Clarity of Clarity Law Firm, Spirit Lake, and David Valentini of Valentini & Associates, Minneapolis, Minnesota, for appellee Christopher Craig Thaemert.

Considered by McGIVERIN, C.J., and HARRIS, LAVORATO, NEUMAN, and ANDREASEN, JJ.

NEUMAN, Justice.

We granted the State's application for discretionary review to consider its challenge to an order suppressing evidence in a drug case. The fighting issue is whether state troopers lawfully impounded the defendants' vehicle or whether—as found by the district court—the impoundment and subsequent inventory search were merely "a subterfuge for further investigation." Because we believe the decision to impound reveals a reasoned exercise of discretion consistent with standardized department of public safety procedures, we reverse and remand for further proceedings.

The facts giving rise to this controversy occurred on the afternoon of April 18, 1994. While traveling north on I–35 at sixty-five miles per hour, Trooper Kelly Smith of the Iowa State Patrol noticed a vehicle rapidly overtaking him. He observed that the car had no front license plate. Judging by the darkness of the vehicle's interior, he also guessed that the car had very dark tinted windows. Smith reduced his speed and the overtaking car did likewise. Not until Smith slowed to fifty miles per hour did the other vehicle pass him on the left.

As the car passed, Trooper Smith noted that the car's windows were unusually dark. Despite the dark tinting, Smith could see that neither the driver nor passenger were wearing seat belts. The violation was particularly evident on the passenger side, where the back of the front seat had been turned around and placed against the dashboard, permitting the passenger to ride facing backwards. The rear of the vehicle displayed an Arizona license plate. Smith ran a registration check. He learned that the car was registered to a woman; both occupants were men.

Smith decided to pull the vehicle over for the seat belt violation. Upon seeing the trooper's lights, the driver—defendant Christopher Thaemert—immediately pulled over. Smith asked to see his driver's license and also asked about the tinted windows. Thaemert told Smith he did not think it was illegal to have dark tinted windows in Arizona.[1] Smith asked Thaemert to accompany him to his vehicle while he issued the citation.

While writing the citation, Smith engaged Thaemert in conversation. He asked Thaemert where the two were traveling. Thaemert told Smith they were returning from Arizona following a few days' vacation. Thaemert then volunteered that he and his passenger, defendant John Aderholdt, were doctors and longtime friends who had attended school together. Thaemert stated he practiced in Minnesota, and Aderholdt in Wisconsin. He explained that they had flown to Arizona to purchase the car, a 1979 Chevy Malibu.

Thaemert's story did not make sense to Smith. The car looked dependable enough, but it had been recently—and poorly—repainted. The interior was in terrible condition. The upholstery was stained and worn, with stuffing coming out of the cushions. It did not strike the trooper as a car worth paying plane fare from the Midwest to buy and drive back.

The trooper also noticed that Thaemert was unusually nervous for a person merely being cited for a seat belt violation. He appeared agitated and "bounced" around in the car, moving his hands a lot. His speech was "very quick and stuttered," and he seemed overeager to deflect any suspicion.

Although Smith had asked to see the car's registration, the defendants instead produced the title. The document was confusing. Despite the license plate check which had shown the car registered to Rosalinda Gonzalez, the title indicated Aderholdt was the current owner. From the title it appeared there had

---

1. The windows later tested at six percent on a tint meter, meaning they only allowed six percent light into the car. Trooper Smith testified that federal and Iowa laws require seventy percent transparency. He later verified that Arizona law requires thirty-three percent, plus or minus a three percent rate of error. Thus it appears that defendants' windows were in violation of either state's laws.

been several intervening purchasers between Gonzalez and Aderholdt. Trooper Smith suspected "title jumping," a scheme whereby cars are bought and sold without registration and the payment of taxes and fees.

Upon securing Thaemert's signature on the citation, Smith asked if there were any drugs or guns in the car and sought permission to search it. Such requests are routine, Smith testified, and in this case his suspicions were aroused. Thaemert gave his consent to search the car.

Smith then returned to the vehicle to give Aderholdt a citation for the seat belt violation. He requested consent from Aderholdt, the owner, to search the car. Aderholdt refused and suddenly became very nervous. He protested that he had brought cars back from Arizona several times before without incident.

Smith candidly advised Aderholdt that he suspected the car contained narcotics and told him that he planned to call a drug dog to sniff around. When Aderholdt protested that he did not want a dog entering his vehicle, Smith informed him the dog would only sniff the car from the outside. Aderholdt then rolled up the car windows and shut the doors. Smith informed Aderholdt that closing up the car would concentrate the odors and help the dog to "hit" better. In a telling move, Aderholdt rolled the windows back down and opened the doors, reinforcing Smith's suspicions.

Aderholdt then offered to produce the plane tickets used by the two men. The tickets were in the trunk. Smith noticed that Aderholdt became markedly more relaxed as he approached the rear of the vehicle. Smith suspected that Aderholdt was trying to get him away from the passenger compartment. When Aderholdt opened the trunk, Smith saw that it was full of junk and debris. Smith found this unusual for a car so recently purchased.

Meanwhile, Smith was still concerned about the registration irregularity. Although it was mid-April, the title indicated that Aderholdt had purchased the car on February 5, 1994. This did not fit with the defendants' claim that the two had flown to Arizona just a few days before to make the purchase. In addition, Smith knew of no state that allows more than thirty days to register a vehicle. According to the title, more than sixty days had passed since Aderholdt purchased the car. Thus the car appeared to Smith to be illegally unregistered.

About this time Trooper Jerry Ostbloom arrived on the scene to assist. After a briefing by Smith, Ostbloom examined the title. He pointed out another problem: the title showed Aderholdt taking title on February 5, 1994, and the prior owner taking title on February 7, 1994. The implication that Aderholdt bought the car from someone who did not even own it convinced Smith that he had sufficient justification to impound the vehicle until the registration issue was settled. He called a towing service to remove the car from the highway and requested the narcotics officer to meet them with the drug dog at the towing garage.

The defendants rode in the tow truck to the garage. Once they arrived, Trooper Ostbloom told them they were free to leave or they could go into the truck stop for coffee while the troopers inventoried the car. Neither defendant was in custody or under arrest. Aderholdt gave Trooper Smith the trunk key. Pursuant to department policy, Smith, Ostbloom and Trooper Madetzke (the narcotics officer who met them at the garage) proceeded to inventory the contents of the vehicle.

Almost immediately, Trooper Madetzke found a marijuana joint in a cigarette case inside a black coat. Madetzke stayed with the vehicle to continue the inventory while Smith and Ostbloom found the defendants and placed them under arrest.

Smith and Ostbloom then rejoined Madetzke to finish the inventory. While Smith was looking under the driver's seat he noticed that the back seat was "off kilter" and appeared to be loose. Madetzke was in approximately the same position, but on the passenger's side. At that point, both Smith and Madetzke smelled a strong odor of marijuana. They lifted up the back seat, which was not bolted down, and several bags of laundry detergent containing what appeared to be bricks of marijuana fell out.

During the course of the inventory, the troopers found a total of nine pounds of marijuana. They also found a brown pill bottle containing approximately one ounce of cocaine.

I. The State charged each defendant with possession of cocaine with intent to deliver, in violation of Iowa Code section 124.401(1)(c) (1995); possession of marijuana with intent to deliver, in violation of section 124.401(1)(d); failure to affix drug stamp to cocaine, in violation of section 453B.12; and failure to affix drug stamp to marijuana, in violation of section 453B.12.

The defendants each filed motions to suppress. In their motions, defendants alleged that the impoundment and subsequent inventory of the car violated their Fourth Amendment right to be free from unreasonable searches and seizures.

In ruling on the motion the court found, first, that the seat belt violations justified the initial stop of Aderholdt's vehicle. The court then reasoned that the resulting detention was "reasonably related in scope to the circumstances which justified the interference in the first place," quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968). The court further found that, based on the following factors, the trooper had a reasonable and articulable suspicion that the car contained narcotics, thereby justifying further detention while a drug dog was summoned to affirm—or dispel—a finding of probable cause: (1) the defendants' extremely nervous behavior; (2) the registration violation; (3) the unreasonableness of defendants' story regarding the purpose of their trip; (4) defendant Aderholdt's actions after being informed a drug dog would be called; and (5) debris in the trunk which was inconsistent with the defendants' statements that the car was newly purchased.

The court ultimately decided to suppress the fruits of the inventory, however, on its belief that the decision to impound was unlawful. Specifically the court concluded the impoundment was neither motivated by a caretaking function nor implemented in accordance with standardized procedures. To the contrary, the court held, the impoundment and inventory were motivated by Smith's investigatory desire to "search for incriminating evidence." It is this conclusion that the State now challenges.

■ II. Before reaching the issue of impoundment, we address defendants' assertion that the court's suppression ruling may be upheld on an alternative ground: that both the initial stop and the ensuing detention were pretextual and violative of the Fourth Amendment. The assignment of error is without merit. As correctly noted by the district court, it is well settled that a traffic violation, however minor, gives an officer probable cause to stop a motorist. *United States v. Cummins*, 920 F.2d 498, 500 (8th Cir.1990), *cert. denied*, 502 U.S. 962, 112 S.Ct. 428, 116 L.Ed.2d 448–49 (1991); *State v. Mitchell*, 498 N.W.2d 691, 693 (Iowa 1993). To justify such a stop, an officer need only have reasonable, not probable, cause to believe the traffic violation has occurred. *State v. Godfrey*, 491 N.W.2d 173, 175 (Iowa App. 1992). Here, although the officer could not see whether the vehicle's occupants might be wearing lap-type seat belts, it was apparent they were not wearing shoulder harness belts. *See* Iowa Code §§ 321.445(2) (seat belt requirement); 321.482 (failure to wear seat belt a simple misdemeanor). Moreover, the officer had reasonable cause to believe the car's windows were tinted in excess of that permitted by law. *See* Iowa Code § 321.438(2).

The record offers no support for defendants' bald assertion that this was an illegal "profile" stop prompted solely by Arizona licensing and registration to an Hispanic-surnamed individual. *See United States v. Garcia*, 23 F.3d 1331, 1335–36 (8th Cir.1994). Even if it were, and the trooper suspected drug trafficking from the outset, that alone would not invalidate an otherwise valid stop. *Cummins*, 920 F.2d at 501.

■ Once a lawful stop is made, an officer may conduct an investigation "reasonably related in scope to the circumstances which justified the interference in the first place." *Cummins*, 920 F.2d at 502 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905). "This reasonable investigation includes asking for the driver's license and

registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." *United States v. Bloomfield,* 40 F.3d 910, 915 (8th Cir. 1994); *see United States v. Barahona,* 990 F.2d 412, 416 (8th Cir.1993). If, as here, the detainees' responses or actions raise suspicions unrelated to the traffic offense, the officer's inquiry may be broadened to satisfy those suspicions. *Barahona,* 990 F.2d at 416; *see also Bloomfield,* 40 F.3d at 912–13, 918–19 (detention of approximately one hour while waiting for drug dog justified where defendant was shaking and nervous, wore pager, had radar detectors on dashboard, gave evasive answers regarding purpose and destination of trip, and refused to consent to search); *Cummins,* 920 F.2d at 502 (detention warranted where defendants displayed nervous and evasive behavior and gave inconsistent answers concerning passenger's identity). Like the district court, we conclude that defendants' detention for approximately fifty minutes while Trooper Smith summoned a drug dog, and then a tow truck, did not exceed the reasonable scope of the initial *Terry* stop. The district court was correct in so ruling.

III. The real controversy centers on the subsequent impoundment of Aderholdt's vehicle and the resulting inventory search that yielded illegal drugs.

■ The legality of any inventory search rests initially on the lawfulness of the impoundment. *State v. Jackson,* 542 N.W.2d 842, 845 (Iowa 1996). To determine whether an impoundment is lawful, "we look for the existence of reasonable standardized procedures and a purpose other than the investigation of criminal activity." *State v. Huisman,* 544 N.W.2d 433, 437 (Iowa 1996).

This two-pronged test for reasonableness adopted in *Huisman* rested largely on the United States Supreme Court's holding in *Colorado v. Bertine,* 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). In *Bertine,* the defendant's van was impounded and inventoried following his arrest for drunk driving. *Id.* at 368–69, 107 S.Ct. at 739, 93 L.Ed.2d at 743–44. Bertine challenged the scope of the inventory search, but also argued that the search "was unconstitutional because depart-

mental regulations gave the police officers discretion to choose between impounding his van and parking and locking it in a public parking place." *Id.* at 375, 107 S.Ct. at 743, 93 L.Ed.2d at 748. Rejecting this argument, the court held that

[n]othing ... prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.

*Id.*

At the suppression hearing, and now on appeal, the State's argument relies heavily on the "reasonable necessity for impoundment" standard articulated in pre-*Bertine* cases such as *State v. Kuster,* 353 N.W.2d 428, 431 (Iowa 1984), and *State v. Casteel,* 392 N.W.2d 168, 170 (Iowa App.1986). Those cases are no longer controlling in light of *Bertine* and its Iowa progeny. As noted in *Huisman,* the holding of *Bertine* shifted the analysis from an assessment of the reasonableness of the officer's decision to a search for whether reasonable standardized policies guided the officers' discretion and whether a purpose, other than investigatory, existed for the impoundment. *Huisman,* 544 N.W.2d at 437. The question is whether the State met that test here.

■ We begin by reviewing the suppression hearing testimony. Trooper Smith testified that he was convinced narcotics would be found in the car. He knew that hunch, however, would not justify impoundment; a drug dog could be (and was) summoned to the interstate. He stated that his decision to impound stemmed solely from his belief that the car was illegally unregistered. The scope of his discretion to make such a decision was then questioned. He admitted that although he had towed vehicles based on registration violations in the past, the numbers were not numerous. He believed that the decision to impound was within his discretion, depending on whether the failure to register appeared inadvertent or, as here, intentional. He could not, however, recite departmental policies guiding that discretion. Trooper Ostbloom, on the other hand, testified that officers follow a procedural manual

with guidelines for determining when to impound. He agreed that much is left to individual trooper discretion. Both troopers testified that, having made the impoundment decision, detailed department rules guided the inventory of the vehicle.

The standardized procedures guiding state trooper impoundment decisions are found at 661 Iowa Administrative Code rule 6.2. The rule states the following vehicles, among others, "may be impounded immediately":

> (1) Vehicles which *an officer has reason to believe are wrongfully possessed* by the person then having control of such vehicles or on which the vehicle identification number or the identification numbers of any component part has been altered or defaced, or on which an attempt to alter or deface has been made.

Iowa Admin.Code r. 661–6.2(1) (emphasis added). Although it appears Trooper Smith believed the Aderholdt vehicle was illegally unregistered, not "wrongfully possessed," he was confronted with a dilemma that would be identical in either case. Just as a trooper could not permit the driving of a stolen vehicle, so also the trooper could not lawfully permit an unregistered vehicle to be driven. *See* Iowa Code §§ 321.17 (misdemeanor for any person to drive or move, or permit to be driven or moved, a vehicle in violation of registration laws); 321.53 (applying registration laws of residency to nonresident driving in Iowa); 321.2 (highway patrol given duty to enforce motor vehicle laws). It is the inevitability of such unforeseen situations that led the Court in *Bertine* to reject a rigid, nondiscretionary standard. *People v. Toohey,* 438 Mich. 265, 475 N.W.2d 16, 26 (1991). The *Bertine* decision itself upheld departmental guidelines which, though standardized, gave officers the flexibility to determine "the feasibility and appropriateness of parking and locking a vehicle rather than impounding it." *Bertine,* 479 U.S. at 375–76, 107 S.Ct. at 743, 93 L.Ed.2d at 748. No less circumscribed discretion is implicated here.

In sum, we believe Trooper Smith's decision was consistent with a reasonable interpretation of departmental regulations and state statutes. His decision, moreover, was not motivated solely by an investigatory pur-

pose. *See Huisman,* 544 N.W.2d at 439. Even though Trooper Smith conceded that he believed further investigation would reveal narcotics, an "investigatory purpose invalidates an inventory search only if the search is conducted for the *sole* purpose of investigation." *Id.* Because there existed an objectively legitimate caretaking reason for impoundment, the district court should not have questioned the trooper's motivation. *Id.*

 Like the decision to impound, the subsequent inventory search must also be (1) conducted according to standardized procedures and (2) administered in good faith. *Bertine,* 479 U.S. at 374, 107 S.Ct. at 742, 93 L.Ed.2d at 757; *Jackson,* 542 N.W.2d at 846. Although the district court did not reach this question (having suppressed on the impoundment issue), our de novo review of the record reveals conformity with routine procedures. All items of personalty were listed on a prescribed form. Notably, the troopers did not abandon the inventory once marijuana was discovered and the defendants were arrested and transported to jail. They pursued the inventory to completion, citing the caretaking and liability concerns underlying the inventory exception to the warrant requirement. *See Jackson,* 542 N.W.2d at 845 (inventory search is justified to protect owner's property, protect police against claims of theft or damage, and protect officers from danger). As for inspection *under* the back seat, Trooper Smith testified that he routinely checks there for valuables particularly where, as here, the seat appears to be loose or ajar. Nothing in the record suggests the troopers deviated in any way from custom or procedure while conducting the inventory. *See Huisman,* 544 N.W.2d at 437 (inventory policies need not be exclusively written).

In summary, we conclude the state troopers' actions in detaining the defendants, impounding the car, and conducting an inventory of the car's contents were consistent with the Fourth Amendment. The district court should not have suppressed the evidence disclosed by the inventory search. Accordingly,

we reverse and remand for further proceedings.

**REVERSED AND REMANDED.**