# IN THE COURT OF APPEALS OF IOWA

No. 20-0652
Filed October 6, 2021

**STATE OF IOWA,**
　　　Plaintiff-Appellee,

**vs.**

**JAMES DOW FLANAGAN,**
　　　Defendant-Appellant.
_____

　　　Appeal from the Iowa District Court for Polk County, Christopher Kemp and Carol L. Coppola, District Associate Judges.

　　　James Flanagan appeals his conviction for second-offense operating while intoxicated. **REVERSED AND REMANDED.**

　　　Martha J. Lucey, State Appellate Defender, and Melinda J. Nye, Assistant Appellate Defender, for appellant.

　　　Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

　　　Heard by Tabor, P.J., and Greer and Schumacher, JJ.

**TABOR, Presiding Judge.**

A jury convicted James Flanagan of operating while intoxicated (OWI), second offense, in violation of Iowa Code section 321J.2 (2019). On appeal, he argues the district court improperly rejected his motion to suppress evidence gathered during a traffic stop. Because the state trooper extended the duration of the stop without cause, we reverse the suppression ruling and remand for further proceedings.

## I.        Facts and Prior Proceedings

Seatbelts save lives. But, as James Flanagan learned, a passenger's failure to buckle up can be costly. Flanagan had been enjoying a September evening with friends at Yellow Banks Park campgrounds when a woman in the group suffered a coughing spell and needed a ride home. Flanagan volunteered to drive her, intending to return afterward.

But good deeds never go unpunished. Flanagan's passenger failed to wear her seatbelt, attracting the attention of Iowa State Trooper Kyle Ratzesberger. Infraction spotted, Ratzesberger initiated a traffic stop. As was his routine, the trooper ran the license plate through his database. He discovered a protective order against Flanagan, the vehicle's registered owner. But Ratzesberger recalled that he didn't "solidify" the name of the protected person before the stop. All he knew was the protected person was a woman. And Flanagan's passenger was also a woman. With the seatbelt infraction and a potential protective-order

violation in mind, the trooper approached the passenger window of Flanagan's car, which pulled into a McDonald's parking lot.[1]

When the trooper asked the passenger why she wasn't wearing her seatbelt, she explained she recently had breast surgery. She believed that medical procedure exempted her from the seat belt requirement. But she didn't have the proper paperwork, so Ratzesberger said he would issue her a ticket. The trooper did not ask the passenger if she was the protected person.

During his minute-long exchange with the passenger, the trooper had little interaction with Flanagan.[2] Yet Ratzesberger testified that he noticed Flanagan's nervousness and reddened eyes. And after those seconds of observation, Ratzesberger asked Flanagan to return to his patrol car with him.

The two were in the patrol car together for about five minutes. During this time, Ratzesberger processed the passenger's ticket and confirmed she was not the protected person under the Flanagan's order. But while looking at his computer screen, the trooper also shifted his investigation to Flanagan, having these exchanges:

> Q. Do you have any medication that you're taking . . . ? A. Just Tylenol.
> Q. You say you're coming from the campgrounds? A. Yeah.
> Q. Were you drinking there? A. No.
> Q. Anything besides that? Were you doing marijuana? A. No.
> Q. Meth? A. No. I'm on some anxiety meds. Antidepressants. A couple of migraine prescriptions. But none of them are . . . you know, none of them prohibit me from driving.

---

[1] The officer's dash cam and body cam videos captured his investigative stop.
[2] For instance, he did not ask the driver about the protective order.

As the trooper printed out the seatbelt ticket, he asked to see Flanagan's tongue. Flanagan complied. Flanagan said his anti-anxiety medication gave him "cotton mouth." The trooper then returned to the passenger and peppered her with questions about where they were coming from and what kind of drugs Flanagan had been using.

Learning nothing that would verify his suspicion, Ratzesberger handed the passenger her ticket, informed her that Flanagan would be completing field sobriety tests, asked her to stay in the car, and returned to his patrol car. But before starting the field sobriety tests, Ratzesberger checked Flanagan's pulse, and found it was higher than normal.

When Flanagan tried to perform the requested field sobriety tests, he could not maintain his balance. Flanagan took a breath test before being placed under arrest. At the station, Flanagan refused to provide a urine sample. But he did submit to another round of field sobriety tests, which went as poorly as the first set. And before the night's end, Flanagan acknowledged he might have consumed gummy worms "laced" with cannabis or used a "vape pen" containing cannabis oil.

The State charged Flanagan with OWI second offense. He moved to suppress evidence from the traffic stop, claiming: (1) trooper Ratzesberger "unlawfully extended" his detention in violation of the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Iowa Constitution, and (2) no reasonable cause justified the field sobriety tests. The district court denied the motion. A jury found Flanagan guilty. And he now appeals.

**II.     Standard of Review**

When, as here, a motion to suppress raises constitutional grounds, our review is de novo.  *State v. Coleman*, 890 N.W.2d 284, 286 (Iowa 2017).  This review "requires an independent evaluation of the totality of the circumstances as shown by the entire record."  *State v. Backes*, 601 N.W.2d 374, 375 (Iowa Ct. App. 1999).  Although we may defer to the district court's factual findings, we are not bound by them.  *State v. Lane*, 726 N.W.2d 371, 377 (Iowa 2007).

**III.    Legal Analysis**

On appeal, Flanagan breaks his suppression argument into three claims: (1) the trooper unlawfully extended the stop's duration; (2) the trooper placed Flanagan in the patrol car without reasonable suspicion; and (3) the trooper impermissibly expanded the stop's scope by asking Flanagan questions unrelated to the seatbelt violation.

**A.     Error Preservation**

Before contesting the merits, the State contends Flanagan only preserved error on the first claim.  It's true that Flanagan's motion to suppress focused on the extended detention.   But at the suppression hearing, Flanagan's attorney developed this point with several "sub-arguments," stating:

> Trooper Ratzesberger exceeded the lawful scope of his investigation under *State versus Aderholt*[, 545 N.W.2d 559 (Iowa 1996)].  The Iowa Supreme Court has concluded when the stop has been made, that a reasonable investigation of that stop does include asking the driver for the driver's license and requesting that the driver sit in the patrol car.  However, we believe that *Aderholt* is factually distinguishable from the current case because in this instance only the passenger had committed the offense.

Thus Flanagan challenged both the scope of Ratzesberger's investigation *and* the trooper's decision to bring him to the patrol car.

Although the State acknowledges Flanagan raised these "sub-arguments," it insists he waived error by accepting that *Aderholdt* was binding precedent. According to the State, rather than trying to factually distinguish *Aderholdt*, Flanagan now seeks to reinterpret it.

We agree appellants cannot create new arguments or flesh out undeveloped arguments. *See, e.g.*, *City of Muscatine v. Northbrook P'ship Co.*, 619 N.W.2d 362, 368 n.2 (Iowa 2000) (failing to preserve due process argument by not citing state or federal constitutional provision to trial court or otherwise explaining constitutional violation). But our error preservation doctrine has never required appellants to cut and paste their arguments from the district court. *See JBS Swift & Co. v. Ochoa*, 888 N.W.2d 887, 893 (Iowa 2016) (characterizing discussion on appeal as "additional ammunition for the same argument"). We find Flanagan preserved error on all three arguments.

## B.     Merits of Suppression Motion

Flanagan argues the district court erred in denying his motion to suppress because Trooper Ratzesberger lacked sufficient cause to place him in the patrol car and pursue an OWI investigation.[3] He alleges those acts extended the duration

---

[3] Flanagan brings his claims under the Fourth Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution. These provisions both protect from unreasonable searches and seizures. U.S. Const. amend. IV; Iowa Const. art. I, § 8. Despite our constitution using nearly identical language, Iowa courts may follow an independent approach when interpreting it. *See, e.g.*, *State v. Ochoa*, 792 N.W.2d 260, 267 (Iowa 2010). So "even where a party has not advanced a different standard for interpreting a state constitutional provision, we may apply the standard more stringently than federal case law." *State v. Pals*, 805

and scope of the stop.[4]  The State counters that the passenger's seat belt infraction, questions about the protective order, and suspicion about Flanagan's impairment justified the trooper's actions.  We will address those reasons in turn.

### 1.  Seatbelt Violation

Flanagan concedes the trooper had probable cause to stop him for the passenger's seatbelt violation.  *See Aderholdt*, 545 N.W.2d at 563; *State v. Godfrey*, 491 N.W.2d 173, 175 (Iowa Ct. App. 1992).  It is the trooper's subsequent actions that Flanagan contests.  Flanagan emphasizes that the authority for a seizure ends "when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *See United States v. Rodriguez*, 575 U.S. 348, 354 (2015).

Here, the video shows that Ratzesberger's investigation of the seat belt violation was cut and dried—requiring a one-minute discussion with the passenger.  When she handed the trooper her identification, he had all the information he needed to process her ticket.  At oral argument, defense counsel acknowledged the trooper had authority to ask for Flanagan's driver's license as well.

But not only did Trooper Ratzesberger take their licenses, he also asked Flanagan to accompany him to the patrol car.  The trooper gave three reasons for doing so: (1) it was his normal practice during traffic stops; (2) he wanted to resolve

---

N.W.2d 767, 771 (Iowa 2011).  And when a party brings a claim under both constitutions, we may consider either or both simultaneously.  *Id.* at 772.

[4] Although we find Flanagan preserved the investigative-scope issue, we believe our supreme court must plow that new ground.  *See Pals*, 805 N.W.2d at 777 (recognizing other state courts have found that seizures must be limited in scope to the purpose of the traffic stop but declining to address issue because it was unpreserved).  Indeed, Flanagan asked our supreme court to retain this appeal for that reason.  Yet it transferred the case to us.

the protective-order issue; and (3) he was concerned the driver might be impaired. But none of the reasons was tied to the passenger's seatbelt violation.

We turn first to the routine-practice rationale. Routine practice is by definition not individualized suspicion. Still, the State maintains the trooper's normal practice is enshrined in our case law. In support, the State quotes *Aderholdt*:

> Once a lawful stop is made, an officer may conduct an investigation reasonably related in scope to the circumstances which justified the interference in the first place. This reasonable investigation includes asking for the driver's license and registration, *requesting that the driver sit in the patrol car,* and asking the driver about his destination and purpose.

545 N.W.2d at 563–64 (emphasis added) (internal quotations and citations omitted).

In opposition, Flanagan rejects a categorical reading of *Aderholdt*. He argues that, read in context, the approval for moving a driver to the patrol car is limited to situations where such a measure relates to the purpose of the stop. But the State points out that our court has treated the *Aderholdt* language as controlling precedent. *See, e.g.*, State *v. Williams*, No. 18-1735, 2019 WL 6358423, at *3 (Iowa Ct. App. Nov. 27, 2019); *State v. Hanrahan*, No. 12-0012, 2013 WL 4009675, at *2 (Iowa Ct. App. Aug. 7, 2013); *State v. Wagner*, No. 06-0012, 2006 WL 3436537, at *2 (Iowa Ct. App. Nov. 30, 2006).

Without settling the parties' dispute about how broadly to read *Aderholdt*, we are persuaded by Flanagan's effort to distinguish his case on its facts. The State cites no case where Iowa courts have relied on the language of *Aderholdt* to allow an officer to move the driver to the patrol car when only the passenger's

conduct precipitated the stop. This factual distinction separates Flanagan's case from *Aderholdt* and its progeny.

Anticipating this distinction, the State cites *Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997) (holding officers, for safety purposes, may order passengers out of stopped cars pending completion of their investigation). But *Wilson* relies on the precept that standing outside a car is a "de minimis" additional intrusion on the passenger's liberty. *See Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977); *see also Wilson*, 519 U.S. at 412.

To distinguish his situation from *Mimms*, Flanagan argues being placed inside a patrol car is a greater intrusion than standing outside one's own car. *See Goss v. State*, 744 So. 2d 1167, 1168 (Fla. Dist. Ct. App. 1999) ("[P]lacing Goss in the patrol car increased the intrusive nature of the stop."); *State v. Lozada*, 748 N.E.2d 520, 525 (Ohio 2001) ("Placing a driver in a patrol car during a routine traffic stop increases the intrusive nature of the detention."); *Lucas v. State*, 15 N.E.3d 96, 104 (Ind. Ct. App. 2014) (holding that transferring driver to patrol car exceeds de minimis level of intrusion of asking a driver to exit their vehicle described in *Mimms*).

We agree. The infringement of Flanagan's liberty was more than de minimis and not justified by *Aderholdt*. Because the passenger's infraction did not provide the trooper sufficient cause to move Flanagan into his patrol car for questioning, the trooper exceeded his authority and improperly prolonged the stop.

Relocation aside, Flanagan claims the trooper's investigative tactics impermissibly extended the duration of the stop. To rebut that claim, the State notes it took only about five minutes for the trooper to process the passenger's

ticket while Flanagan sat in the patrol car. But during that five minutes, according to Flanagan, the trooper was less than expeditious, asking him "questions about where he'd been, what medications he was taking, why his glasses were broken, and whether he'd used illegal drugs that night."

We agree with Flanagan that those off-topic questions prolonged the stop beyond the time reasonably required to complete its traffic-related mission. *See In re Pardee*, 872 N.W.2d 384, 395 (Iowa 2015) (citing *Rodriguez*, 575 U.S. at 357). In *Pardee*, our supreme court was critical of a trooper "blending" drug interdiction questions with the routine processing of a traffic stop.[5] *Id.* at 396. That blending extended the stop beyond the five minutes it should have taken to issue a warning ticket. *Id.* at 396 n.11.

Our court has also applied the blending test. *State v. Carroll*, No. 15-0970, 2016 WL 3274500 (Iowa Ct. App. June 15, 2016). In *Carroll*, the driver was pulled over for a speeding violation. *Id.* at *1. But "while putatively processing [the ticket], the officer attempted to elicit a confession that he used drugs," asking questions like: "So why are you so nervous?" and "[What have you] ingested in the last twenty-four hours." *Id.* at *1, 3. Relying on *Pardee*, we held the officer exceeded her authority under the stop and affirmed the district court's decision to suppress. *Id.* at *3–4.

---

[5] The State argues *Pardee* does not apply to Flanagan's case because there the extension of the stop was for drug interdiction purposes and Trooper Ratzesberger was not doing drug interdiction. But we see no difference between extending the duration of the stop with unrelated questions that lead to a dog sniff and extending the duration of the stop with unrelated questions that lead to field sobriety testing.

We believe a similar finding is appropriate here. It is undisputed that the trooper pursued an investigation beyond the seatbelt violation. By his own admission, he brought Flanagan to the patrol car so that he could "start questioning the driver about other things." While in the patrol car, Ratzesberger asked about drug use and to see Flanagan's tongue. And he continued his "blended" investigation when he returned to the passenger. Rather than handing her the ticket and completing the stop, he peppered her with questions about Flanagan's drug use. Those inquiries did not concern the passenger's seatbelt. And this mixed approach to his investigation extended the duration of the initial traffic stop.

### 2.    Protective Order

The State next suggests the trooper had authority to bring Flanagan into his patrol car to resolve his questions about the protective order. The State argues:

> Although not stated directly, Trooper Ratzesberger's testimony implies that he was concerned about leaving [Flanagan] in the car with the passenger while he investigated the protective order and removed him to ensure the passenger's safety, just in case she was the protected party. It is very possible that Trooper Ratzesberger, in his experience as on officer, knew it would keep the passenger safer if he removed [Flanagan] while investigating the protective order.

Flanagan responds that the trooper's concern about the protective order violation was a "mere hunch" and "the most reasonable and least intrusive means to dispel his suspicion would be to ask the passenger to come sit in the patrol car, not Flanagan."

We agree with Flanagan that the trooper's concerns about the protective-order violation did not rise to the level of reasonable suspicion.[6] In fact, the

---

[6] The record shows the trooper knew (1) the registered owner of the vehicle had a protective order in force against him; (2) the protected person was a woman;

prosecution agrees with that assessment. At oral argument, counsel for the State conceded that the trooper could not have initiated the traffic stop based only on the random check of Flanagan's license plate that revealed the existence of the protective order—coupled with presence of a female passenger. That concession leads us to ask: If these facts do not support an initial stop, how can the trooper rely on the same facts to justify a heightened intrusion into Flanagan's liberty during the stop based on his passenger's seatbelt violation?

The trooper did not gather any information during his seatbelt investigation suggesting a protective-order violation. For example, the passenger did not appear uneasy in Flanagan's company. On this record, the protective order did not provide the trooper with grounds to further impinge on Flanagan's liberty.

But assuming the trooper could clear up any question about the protective order as part of his seatbelt investigation, to ensure that he did not prolong the duration of the stop, we examine whether he "diligently pursued a means of investigation that was likely to confirm or dispel [his] suspicions quickly, during which time it was necessary to detain [Flanagan]." *See United States v. Sharpe*, 470 U.S. 675, 686 (1985).

We find the trooper could have been more diligent in resolving the protective-order issue. He discovered the order when he ran Flanagan's plates. But he did not check for the protected person's identity until *after* he brought Flanagan into his patrol car. The State gives two justifications for that roundabout

---

(3) the driver and the registered owner were likely the same person; and (4) the passenger was a woman. But roughly half of the population is a woman. So being with someone of the same sex as a protected party, without more, was not enough for reasonable suspicion.

approach: (1) it was difficult for the trooper to check for the protected person's identity while driving his patrol car; and (2) because the trooper was concerned about possible aliases, he did not check the name before approaching Flanagan's vehicle.

But those justifications are unconvincing. On the one hand, we agree it may be difficult to read a screen while driving. On the other hand, Ratzesberger managed to gather other information from his screen: the name of the car's registered owner, the existence of the protective order, and the fact that the protected person was a woman. But, for some reason, he decided to wait until Flanagan was in the patrol car to verify the name of the protected person. Which brings us to the next justification: the trooper's testimony that "a lot of times people have a/k/a names or miscellaneous names they go by." It is unclear why that phenomenon required the officer to bring Flanagan to his car. In sum, neither of the State's proffered justifications carry the day. The State did not establish that resolving any questions about the protective order justified placing Flanagan in the patrol car or prolonging the seatbelt stop.

### 3. Suspicion of Impairment

Alternatively, the State contends the trooper's suspicion about Flanagan's impairment justified moving him into the patrol car and expanding beyond the seatbelt investigation.

But the record does not support that contention. The trooper's interaction with Flanagan from the passenger's window took less than one minute. The trooper acknowledged his "main focus was asking the passenger about her seatbelt violation and then gaining his information to see if there was a protection

order." The trooper testified: "The only thing I could see with him was just his general demeanor seemed nervous or fidgety and his eyes had a very distinct reddened conjunctiva which is consistent with something I want to further investigate."

We have held similar facts did not allow for the prolonged detention of a driver stopped for speeding. *See Carroll*, 2016 WL 3274500, at *3–4 (concluding officer's "observations of Carroll's nervousness" and "bloodshot, watery eyes" did not amount to reasonable suspicion to extend a traffic stop). We reach the same result here. Flanagan's nervousness and reddened eyes did not give the trooper reasonable suspicion to investigate impaired driving. Many motorists "get nervous when a state trooper draws near." *Pardee*, 872 N.W.2d at 394. And similarly a driver's reddened eyes, coming from a campfire, without more, falls short of reasonable suspicion of impairment. *See, e.g.*, *State v. Knight*, 853 N.W.2d 273, 278 (Iowa Ct. App. 2014) (bloodshot eyes, odor of alcohol, and admission of drinking); *State v. Marks*, 644 N.W.2d 35, 38 (Iowa Ct. App. 2002) (same).

What's more, moving violations are often central to OWI reasonable suspicion analyses. *See, e.g.*, *Marks*, 644 N.W.2d at 38 (speeding violation considered in reasonable cause analysis). But Flanagan's driving was not at issue: it was neither the reason for the stop nor did he have problems as he pulled into the McDonald's parking lot.

To recap, we hold that the trooper impermissibly prolonged the passenger's seat belt investigation by moving Flanagan to his patrol car and posing unrelated questions. All evidence obtained after the trooper placed Flanagan in the patrol

car must be suppressed. We vacate Flanagan's conviction and remand for further proceedings in accordance with this opinion.[7]

**REVERSED AND REMANDED.**

Schumacher, J., concurs; Greer, J., dissents.

---

[7] Because reversing the suppression ruling precludes the State from offering any evidence of Flanagan's impairment, we need not reach the other issues he raises on appeal.

**GREER, Judge** (dissenting).

The well-written majority opinion addresses the crux of the issue but finds the traffic stop was extended without sufficient cause. From that conclusion, I must dissent. I would affirm the district court ruling denying James Flanagan's suppression motion because the investigation into the protective order and the observations of Flanagan by Trooper Kyle Ratzesberger, a trained drug recognition expert (DRE),[8] at the traffic stop allowed the duration and scope of the stop to be expanded. In making a traffic stop there are inquiries that are allowed. "Beyond determining whether to issue a traffic ticket, an officer's mission" may include typical inquires incident to the stop, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 349 (2015). "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.*; *accord In re Prop. Seized from Pardee*, 872 N.W.2d 384, 393 (Iowa 2015). Trooper Ratzesberger's inquiries lead to an expanded scope stop.

In my view, this case falls into a category where a traffic-violation stop leads to the officer recognizing a strong possibility of other criminal activity justifying

---

[8] Trooper Ratzesberger testified the DRE certification required training in advanced "field of expertise on trying to detect the impairment on drivers road side other than alcohol." Since his certification in 2015, he had been called to the scene of other investigatory DRE stops more than 100 times. On his own, he opined he investigated between eighty and one hundred operating-while-intoxicated stops per year. He testified, "I can see impairment signs . . . a little bit more quicker than the average officer."

further investigation. Here the trooper diligently and efficiently handled the concerns raised during the stop: (1) dealt with the seatbelt ticket, (2) resolved the possible protective order violation, and (3) evaluated the observed condition of the vehicle's driver, Flanagan. Trained as a DRE, Trooper Ratzesberger's observations of Flanagan's impairment were reasonable and required further investigation.

First, the majority states, "Because the passenger's infraction did not provide the trooper sufficient cause to move Flanagan into his patrol car for questioning, the trooper exceeded his authority and improperly prolonged the stop." Under this record, I find nothing wrong with asking Flanagan to move to the patrol car. The trooper had information that Flanagan was restricted by a protective order involving a woman as the protected party. In hindsight, Flanagan argues the safest alternative was to bring the passenger to the vehicle, but this ignores the ability of the driver to cause a disruption behind the wheel. Although Trooper Ratzesberger could have handled this interaction a number of ways, I would refrain from micromanaging law enforcement choices as long as the choice made safely, yet legally, accomplishes the goal of safety on our highways. In the context of a valid stop and investigation, I find it reasonable the trooper would not address the protective order at the window of the car when Flanagan was behind the wheel and would not leave Flanagan alone with the female passenger while the trooper checked the woman's identification against the information. And, keeping Flanagan in the patrol car while investigating the identity of the protective party affords the trooper an element of safety should Flanagan chose to flee the scene. While noting the existence of a protective order involving Flanagan, without

more, would not justify a stop, once the stop was made, it is not unreasonable to conduct the inquiry under a safe and secure process.[9]

Next, I would not find the duration or the scope of the stop was extended without cause. At the onset of the stop, Trooper Ratzesberger observed Flanagan's nervousness and "very distinct reddened conjunctiva" and watery eyes. The trooper's suspicions were raised. Once in the patrol car, which I find to be a reasonable request under these facts, the trooper observed more serious indicators of impairment. Flanagan's speech was "pasty" and he talked with "cotton mouth." Trooper Ratzesberger noted a "chemical-like odor" coming from Flanagan, typically occurring after use of marijuana or methamphetamine, in the trooper's experience. Likewise, Flanagan rambled about random topics not initiated by the trooper. When Trooper Ratzesberger asked to see Flanagan's tongue, he observed a dry "sandpaper" texture consistent with drug use. The trooper also took Flanagan's pulse and noted an elevated heart rate—also consistent with drug use per the trooper. All of these indicators supported the trooper's decision to conduct field sobriety tests.[10] Flanagan attempted the field tests but performed poorly, with some tests showing the signs of stimulant use. Again, confirming the suspicions of Trooper Ratzesberger.

The majority asserts we have no Iowa authority that would "allow an officer to move the driver to the patrol car when only the passengers conduct precipitated the stop." But, I would urge that *Aderholdt* supports the trooper's decision to

---

[9] Trooper Ratzesberger described a concern that law enforcement has to "not allow[] people to go down the road with somebody they're not supposed to."

[10] The trooper discovered during the stop that the two vehicle occupants had been at a camping ground where known drug usage occurred.

remove a vehicle's occupant especially in light of the other concerns raised during the stop. *State v. Aderholdt*, 545 N.W.2d 559, 565 (Iowa 1996) (holding a reasonable investigation allowed law enforcement to view the driver's license and registration along with requesting the driver to sit in the patrol car after stopping the vehicle for seatbelt violations by the driver and passenger). The focus should be on the reasonableness of the investigation once concerns are apparent. Still law enforcement officers are allowed to conduct a reasonable investigation of a traffic infraction, which "includes asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." *State v. Salcedo*, 935 N.W.2d 572, 578 (Iowa 2019) (citation omitted). "[A]n officer may detain the *occupants* of a vehicle during a traffic stop while the officer completes a number of routine but somewhat time consuming tasks related to the traffic violation." *Id.* at 580 (altered for readability) (emphasis added) (citations omitted). The routine checks include "run[ning] a computerized check of the vehicle's registration and insurance; run[ning] a similar check of the *occupants*' identification documents and criminal histories; prepar[ing] the traffic citation or warning; and ask[ing] the *occupants* about their destination, route, and purpose." *Id.* (emphasis added). Thus, law enforcement's attention can be to the occupants of the vehicle.

Under this record, I would not find that the trooper impermissibly extended the duration of the stop. At the time the traffic-stop infraction was handled, Trooper Ratzesberger already had concerns about Flanagan's condition because of the observations he made as a trained and skilled investigator, signs of impairment that then justified further inquiry. While the majority characterizes the questions

as "'blending' drug interdiction questions" the questioning took little time and solicited information related to the trooper's observations as opposed to just a "fishing" expedition. "[Q]uestions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention." *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007) (quoting *United States v. Childs,* 277 F.3d 947, 953–54 (7th Cir. 2002)). The initial questions related to legitimate concerns over the protective order then led to suspicions of impairment, so the sequence of events supports expanding the scope of the investigation.

Here, the trooper began the process of addressing the traffic stop but had a legitimate concern about the circumstances surrounding the protective order. As the trooper dealt with those two concerns, it became apparent that there were suspicions of impairment involving Flanagan. Law enforcement may "make reasonable inquiries to address the traffic infraction and 'attend to related safety concerns.'" *Salcedo*, 935 N.W.2d at, 580 (quoting *Rodriguez*, 575 U.S. at 354). Under a "reasonable investigation" focus, law enforcement may expand the investigation "to satisfy suspicions of criminal activity unrelated to the traffic infraction based upon responses to reasonable inquiries." *Id.* at 578. Such an expansion, though, requires the officer to identify "specific and articulable facts which, taken together with rational inferences from those facts" amount to reasonable suspicion justifying further investigation. *Id.* (citation omitted). I would find Trooper Ratzesberger identified those facts and was justified to investigate.

Thus, under our de novo review and considering the totality of the circumstances, I would affirm the denial of the motion to suppress and affirm

Flanagan's conviction.  *See State v. Smith*, 919 N.W.2d 1, 4 (Iowa 2018) *(*"[W]e independently evaluate the totality of the circumstances as shown by the entire record." (quoting *State v. White*, 887 N.W.2d 172, 175 (Iowa 2016))).